Charles L. BRACEWELL, Appellant,

v.

W.T. BRACEWELL, Appellee.

No. 14–97–00884–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 24, 2000.

Rehearing Overruled June 22, 2000.

Daryl L. Moore, Houston, for appellants.

Kenneth H. Keeling, Huntsville, for appellees.

Panel consists of Justice YATES, FOWLER, and FROST.

## OPINION

WANDA McKEE FOWLER, Justice.

This is an appeal from a will contest. The dispute involves two wills purportedly executed by Irene Bracewell, one in 1975, and the other in 1989. Irene's son, Charles L. Bracewell, appeals a jury's determination that Irene lacked the requisite testamentary capacity to execute a will in 1989, and the trial court's subsequent decision to grant an application to probate the 1975 will that was filed by Irene's husband, W.T. Bracewell. For the reasons set out more fully below, we affirm.

### I. Background

W.T. was born on December 22, 1911, and Irene was born on February 20, 1913. W.T. married Irene in 1928, when he was sixteen years of age and she was fifteen. During the course of their marriage, W.T. and Irene owned a little over eight hundred acres outside of Bedias, Texas. They also owned the mineral rights to that land. W.T. operated a cattle ranch, and he maintained two lakes on the land, including one that he named Lake Irene, after his wife, on which he sold fishing leases. Their daughter, Bobbie, was born in 1932, and their son, Charles, was born in 1936. In 1961, Irene purportedly executed a will which left her entire estate to Charles. At some point during the 1960s, Irene left

W.T. and moved in with Charles at his home in Houston, Texas. Irene eventually returned to W.T. and, on November 20, 1975, they executed a joint will. Under the terms of that will, Irene would inherit the entire Bracewell estate in the event of W.T.'s death. If Irene died first, however, then W.T. would inherit everything.

During the 1970s, W.T. and Irene deeded several tracts of land to both Charles and Bobbie as gifts. Bobbie and her husband, E.C. Rigby, also purchased some land from W.T. and Irene and built a home on that property. W.T. made other cash gifts to Bobbie and her husband in or around 1984. In total, Bobbie and her husband purchased, or were deeded, just over three hundred acres of property belonging to W.T. and Irene. Charles was given approximately four hundred and ninety-two acres of property, including the land which contained W.T. and Irene's home. Charles also had a home on one of the property's lakes, in addition to a house in Colorado where he resided part of the time.

Irene suffered from poor health during the latter portion of her life. Her medical records show that, in the 1970s, she battled nervousness, anxiety, hypertension, hypothyroidism, and degenerative joint disease. Doctors prescribed a variety of medications to treat Irene's medical conditions. In 1984, Irene was hospitalized, and she was diagnosed with Parkinson's Disease. Additional medication was prescribed to treat that ailment as it progressed. Irene's medical records reflect that she had a history of abusing her medications. Her doctors were particularly concerned about her use of the tranquilizers that were prescribed to treat her anxiety disorder, in addition to the other medications prescribed for joint pain and for Parkinson's Disease.

The parties do not dispute that, although Irene had tremendous love and devotion

for her son, W.T. and Charles did not get along. In March of 1989, Irene reportedly discovered that W.T. had executed another will which made Bobbie the sole heir of his estate. On July 10, 1989, W.T. revoked a power of attorney which had placed Charles in control of W.T.'s affairs. On July 12, 1989, Irene executed an affidavit prepared by John Fultz, a local attorney, which expressed her desire that Charles should keep the land which had been deeded to him previously as a gift. Irene also executed a "General Power of Attorney," on July 25, 1989, designating Charles as her "Attorney-in-Fact." On August 17, 1989, Irene, unbeknownst to W.T., executed another will, and she gave that document to Charles for safekeeping. Irene's physical and mental condition continued to worsen and, in 1994, she moved into a nursing home. Irene died on May 9, 1995, at the age of eighty-two.

Shortly after Irene's death, W.T. filed suit against Charles seeking to set aside the gifts of land that he and Irene had made to Charles.[1] W.T. also sought to probate the 1975 joint will. Charles filed Irene's 1989 will for probate over W.T.'s objection that Irene was not competent when that document was executed. In a consolidated proceeding, a jury agreed with W.T. and found that Irene lacked testamentary capacity to execute the 1989 will. The jury also found that the 1975 will was a valid, properly executed document. Following that verdict, the trial court granted W.T.'s application to probate Irene's 1975 will. This appeal followed.

## II. Issues Presented

In this appeal, Charles contends that the trial court erred in denying his application to probate Irene's 1989 will because he "conclusively established" that it was "executed with the formalities required by law and there is legally insufficient evidence— or factually insufficient evidence—to sup-

---

1. In that separate lawsuit, a jury evidently found in W.T.'s favor and set aside the gifts of land to Charles. That case is on appeal be-

fore the First Court of Appeals for the State of Texas.

port the jury's finding that Irene lacked the testamentary capacity to execute the '89 will." Charles complains further that the trial court erred in granting W.T.'s application to probate the 1975 will because "there is no evidence that it was executed with the formalities required by law." In addition, Charles maintains that the trial court erred by asking the jury to decide whether either of Irene's wills were "true and valid."

### III. Discussion—The 1989 Will

In his first issue on appeal, Charles asserts that the trial court erred in denying his application to probate the 1989 will. In particular, Charles contends that the evidence presented at trial established that the 1989 will was properly executed with the requisite legal formalities. He complains further that there is legally and factually insufficient evidence to support the jury's finding that Irene lacked the testamentary capacity to execute a will on August 17, 1989. In response, W.T. insists that the 1989 will was invalid. As support for that position, W.T. points to expert testimony from Irene's treating physician and another doctor which purportedly shows that Irene was not competent to make the 1989 will.

### A. Standard of Review: Legal Sufficiency

■■■ As proponent of the 1989 will, Charles had the burden to show that Irene had the requisite testamentary capacity on the day that she signed it. *See Guthrie v. Suiter,* 934 S.W.2d 820, 829 (Tex.App.— Houston [1st Dist.] 1996, no writ) (citing *James v. Haupt,* 573 S.W.2d 285, 288 (Tex. App.—Tyler 1978, writ ref'd n.r.e.)). When an appellant attacks the legal sufficiency of an adverse fact finding on an issue for which he had the burden of proof, he must demonstrate on appeal that the evidence established that issue "as a matter of law." *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983) (citing *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112 (Tex.

1976)). Under the requisite two-prong analysis, the reviewing court must examine the record for evidence which tends to support the finding, while disregarding all evidence and inferences to the contrary. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989) (citing *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985)); *see also* W. Wendell Hall, *Standards of Review,* 29 St. Mary's L.J. 351, 482 (1998). If there is no evidence to support the jury's verdict, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *See Sterner,* 767 S.W.2d at 690 (citing *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Texas & N.O.R. Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522 (1947)). In a review for legal sufficiency, "[t]he evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury reached]." *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 24 (Tex.1994) (citing *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 600 (Tex.1993) and *National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373, 376 (Tex.1994)). In other words, "[t]here must necessarily be a logical connection, direct or inferential, between the evidence offered and the fact to be proved." *Moriel,* 879 S.W.2d at 24 (citing *Lyons,* 866 S.W.2d at 600 (citing *Pittman v. Baladez,* 158 Tex. 372, 312 S.W.2d 210, 216 (1958)). Accordingly, in evaluating whether evidence is legally sufficient to support a jury verdict, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Moriel,* 879 S.W.2d at 25. If the evidence is legally sufficient, we may not reverse the trial court's judgment on that basis. *See id.* at 24.

### B. Testamentary Capacity

■■■ In the instant appeal, Charles complains that the evidence adduced at trial is legally and factually insufficient to

support the jury's finding that Irene lacked testamentary capacity to execute a valid will on August 17, 1989. To probate a will, a trial court first must find that it is a valid one under the Texas Probate Code. *See Guthrie*, 934 S.W.2d at 829. The Texas Probate Code requires proof that the will's testator had a "sound mind" before probate will be allowed. *See* TEX. PROB. CODE ANN. § 88(b)(1) (Vernon 1980). Courts in Texas have defined the term "sound mind" to mean "testamentary capacity." *See Chambers v. Chambers*, 542 S.W.2d 901, 906 (Tex.Civ.App.—Dallas 1976, no writ) (citing *Nass v. Nass*, 224 S.W.2d 280, 283 (Tex.Civ.App.—Galveston 1949), *aff'd on other grounds*, 149 Tex. 41, 228 S.W.2d 130 (1950) and *Garcia v. Galindo*, 189 S.W.2d 12 (Tex.Civ.App.—San Antonio 1945, writ ref'd w.o.m.)). Thus, to form a valid will, in Texas, the testatrix must have had "testamentary capacity" when the will was executed. *See Chambers*, 542 S.W.2d at 906. Testamentary capacity has been defined by Texas courts to mean "sufficient mental ability, at the time of the execution of the will, to understand the business in which the testatrix is engaged, the effect of her act in making the will, and the general nature and extent of her property." *Hoffman v. Texas Commerce Bank Nat'l Ass'n*, 846 S.W.2d 336, 340 (Tex.App.—Houston [14th Dist.] 1992, writ denied) (citing *Lowery v. Saunders*, 666 S.W.2d 226, 232 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.)). The testatrix must also know her next of kin and the natural objects of her bounty, and she must have "sufficient memory to assimilate the elements of the business to be transacted, to hold those elements long enough to perceive their obvious relation to each other, and to form a reasonable judgment as to them." *Jones v. LaFargue*, 758 S.W.2d 320, 325 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (citing *Prather v. McClelland*, 76 Tex. 574, 13 S.W. 543 (1890) and *Lowery*, 666 S.W.2d at 232); *see also Lindley v. Lindley*, 384 S.W.2d 676, 683 n. 1 (Tex.1964) (setting out the elements of testamentary capacity).

At trial, the jury was asked the following question with regard to Irene's testamentary capacity to execute the 1989 will:

> Do you find from a preponderance of the evidence that IRENE L. BRACEWELL had testamentary capacity, as that term is defined herein, on August 17, 1989 when the alleged will marked Exhibit P–1 was signed?

In response to that question, the jury answered: "We do not." Because an analysis of the legal sufficiency of this verdict requires a review of the evidence that tends to support the jury's finding, a summary of the relevant testimony is set out below.

### C. Evidence Presented by W.T.

In his brief, W.T. contends that the trial record shows that Irene lacked testamentary capacity on the day the 1989 will was executed. At trial, W.T. testified that Irene was hospitalized in 1984. According to W.T., Irene was "sick a lot" from that time on, and that she was a different woman. W.T. stated that, following her diagnosis with Parkinson's Disease, Irene quit driving a car, quit going to church, and "didn't want no company." W.T. concluded that, in 1989, "Irene was in pretty bad shape." In addition to his own testimony, W.T. offered the following witnesses in support of his contention that Irene was not legally competent to execute the 1989 will: (1) Bobbie Bracewell Rigby; (2) Linda Grisset; (3) Dr. Luke Scamardo; and (4) Dr. Gary Newsome. That testimony is summarized below.

### 1. Bobbie Bracewell Rigby

W.T. and Irene's daughter, Bobbie Bracewell Rigby, testified on W.T.'s behalf. According to Bobbie, Irene's health "got bad in 1984." She added that, although Irene had been a devout woman previously, her mother quit going to church because of her condition. Bobbie stated further that, after 1984, Irene socialized with other people less frequently.

Bobbie reported that, during 1987, and most of 1988, she visited Irene every day so that she could bathe her mother, brush her teeth, and fix her hair. Bobbie added that Irene "acted like a little child" while her daughter brushed her teeth for her. Bobbie testified that Charles sent a letter to "Dr. Jankovic" in Houston, Texas, in October of 1987, which recited Irene's medical history. In that letter, Charles reported that his mother had been taking "pain pills, tranquilizers, and sleeping pills" for thirty years or "maybe longer." Charles wrote further that Irene's Parkinson's Disease was "continu[ing] to get worse." During the summer of 1989, Bobbie and her husband traveled to Pennsylvania to pursue his work in the oil pipeline industry. Bobbie noted that she "didn't think" that Irene was "of sound mind" during the 1989 time period "because the way she was about church and everything." In 1991, Bobbie wrote a letter to Charles and expressed her concern that something was wrong with Irene, who did not appear to realize that Bobbie had moved away.

## 2. Linda Grisset

■■■ Linda Grisset is Bobbie's youngest daughter and W.T.'s granddaughter. Linda described her relationship with her grandmother, Irene, as a "close" one. Linda testified that, from 1975 through 1979, Irene never missed a single Sunday church service, and that she went to the beauty parlor every Wednesday. In addition, Irene helped out at her church by cleaning, vacuuming, wiping song books, and doing "whatever needed to be done." During that time, Irene loved to read and would help Linda with her schoolwork. Linda described Irene as a "nervous lady." Linda testified that, in 1984, after a stay in

the Madison County Hospital, Irene stopped driving and quit going to church altogether. Linda was married on August 21, 1989. Linda testified that she visited Irene on the afternoon of Thursday, August 17, 1989[2], to tell her grandmother about her wedding plans. According to Linda, Irene would not "respond to anything" and "couldn't relate" to her granddaughter at all on that day. Linda testified further that Irene was "absolutely not" in a sound frame of mind on August 17, 1989, that she was in that same condition "[m]ost of the time, and had been for awhile."

## 3. Dr. Luke Scamardo

Dr. Luke Scamardo is a physician specializing in internal medicine at the Navasota Medical Center in Navasota, Texas. Dr. Scamardo treated Irene from November of 1980, until her death in 1995, for a number of ailments, including Parkinson's Disease, hypothyroidism, anxiety, and degenerative joint disease. Dr. Scamardo noted that Irene was taking "multiple medication[s]" for these maladies. Dr. Scamardo testified that he prescribed the "minor tranquilizer" Librium to treat Irene's anxiety and, later, Diazepam, which is a relative of Valium. In addition, Dr. Scamardo prescribed Sinequan, which he described as a "major tranquilizer," for Irene's anxiety. Dr. Scamardo also prescribed Valium to treat Irene's anxiety disorder. During the course of her treatment for anxiety, Irene was also taking pain killers for degenerative joint disease in addition to thyroid medication. After she was diagnosed with Parkinson's Disease, Dr. Scamardo prescribed Sinemet and a number of other medications to treat symptoms related to that condition.

---

**2.** Charles complains that this testimony is of questionable worth because, at the beginning of the suit, Linda did not remember that she spoke with her grandmother on this day. A discrepancy like this does not invalidate the testimony; it merely creates a discrepancy for the jury to resolve. *See Gorges Foodservice, Inc. v. Huerta,* 964 S.W.2d 656, 677 n. 9

(Tex.App.—Corpus Christi 1997, no pet.) (noting that discrepancies between a discovery response and testimony at trial go only to credibility as a witness, which is a matter solely for the jury). Thus, it is appropriate for us to consider it as evidence supporting the verdict. *See id.*

Other medications were also prescribed to treat that disease, with varying results. Dr. Scamardo explained that Parkinson's Disease affects a person's "skeletal muscles," and can deteriorate further to cause "mental problems" as well. Dr. Scamardo noted that "older folks" suffering from Parkinson's Disease typically have more mental than physical problems as they age.

Dr. Scamardo testified that he was informed by Charles, in 1987, that Irene was experiencing "periods of incoherence" at home. Dr. Scamardo added that Irene's family had to supply information for her when she came in for treatment because she was incoherent "ninety-nine percent" of the time. Medical records admitted at trial show that, in May of 1987, Irene was admitted to the hospital for problems related to Parkinson's Disease, degenerative joint disease, and dehydration. It was also reported that she had "problems with incoherence and extreme anxiety" and was refusing to take her medication at that time. Dr. Scamardo described Irene's condition in 1987 as "worsening," and that her Parkinson's Disease was "progressing, [and] increasing." Medical records from Dr. Scamardo show that he characterized Irene's Parkinson's Disease as "severe" during 1987. Dr. Scamardo was also concerned that Irene was "abusing" her medications. At the time, Dr. Scamardo was worried that Irene was dependent upon tranquilizers.

After W.T.'s counsel instructed Dr. Scamardo on the applicable legal standard, Dr. Scamardo testified that, in his opinion, Irene would not have had testamentary capacity on the day she executed the 1989 will. Dr. Scamardo explained that he based this opinion on Irene's "anxiety course" during her entire treatment history. He elaborated further that, during the time he treated Irene, she had periods in which she would become "more anxious, [and] more incoherent." According to Dr. Scamardo, on August 17, 1989, Irene would have been unable to "keep up with all the complicated dealings of making out a will, [and] dealing with business dealings."

### 4. Dr. Gary Newsome

In 1992, Dr. Scamardo referred Irene to Dr. Gary Newsome. Dr. Newsome is a medical doctor and a licensed psychiatrist at the Columbia Hospital in Bryan, Texas, where he is certified in "Geriatric Psychiatry." Dr. Newsome first examined Irene on April 14, 1992. Dr. Newsome testified that, on that date, Irene was "extremely confused," and suffering from "delirium." Dr. Newsome described Irene's "confused state" as both "acute" and "chronic." He further observed "indications that [Irene] had a dementia process" which, given her treatment history, "probably had been going on for some time." Dr. Newsome estimated that, at the time he first saw Irene, she had suffered from dementia "for somewhere probably in the realm of ten to fifteen years, maybe." Dr. Newsome explained that the medicines used to treat Parkinson's Disease increase the level of "dopamine" in the brain, which can cause schizophrenia-like symptoms such as hallucination, confusion, and delirium. Dr. Newsome added that Parkinson's Disease causes a "degeneration of the brain" which affects patients' ability to "think clearly and put their proper processes together and be able to function, even in the most simple way." Therefore, Dr. Newsome emphasized that a Parkinson's Disease patient's medication regimen is a "very difficult process" for a treating physician to manage.

Dr. Newsome reviewed Irene's medical records dating from the 1970s, and he also reviewed records from the Clouser Pharmacy for the year 1989. Dr. Newsome observed that Irene was "taking some pretty heavy duty medication" during the time she signed the 1989 will. He noted further that "she was having evidence of confusion" as early as 1984. Dr. Newsome explained that people who are diagnosed with Parkinson's Disease later in life have

a "much greater incidence of ... having significant depression, dementia and even worse psychiatric symptoms of delusions and hallucinations and paranoia." Dr. Newsome added that Irene's condition may have been worsened by the fact that Irene misused her medication.

After W.T.'s counsel instructed Dr. Newsome on the relevant legal standard, Dr. Newsome was asked whether, on August 17, 1989, Irene could have had the necessary testamentary capacity to execute a will. Dr. Newsome answered that, "based on all the records and [his] training, and with reasonable medical certainty, [he] firmly believe[d] that she did not have testamentary capacity at that point in time." In Dr. Newsome's opinion, Irene's lack of competency wasn't even a "close" question. Dr. Newsome added that, given the medications described in the Clouser Pharmacy records, he was "not sure if [he] would know what planet [he] was on if [he] took these medicines." Dr. Newsome commented further that Irene's decision to lock herself in the bathroom for the purpose of executing her will could be considered an indication of the level of her paranoia at the time. Dr. Newsome also noted that Irene's decision to leave the bulk of her estate to Charles showed that she was unaware of her "bounty" and unaware that she had any children "other than Charles Bracewell."

 Charles complains that the testimony presented by Drs. Scamardo and Newsome is "no evidence to support a finding that Irene lacked testamentary capacity on the day she executed the will" because each concedes that he did not examine Irene on August 17, 1989. It is generally true that, in a will contest, "the proper inquiry is whether the [testatrix] had testamentary capacity on the day the will was executed." *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex.App.—Fort Worth 1998, no pet.) (citing *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex.1968)). However, a reviewing court "may also look to the [tes-

tatrix's] state of mind at other times if these times tend to show [her] state of mind on the day the will was executed." *Id.; see also Chambers v. Chambers*, 542 S.W.2d 901, 907 (Tex.Civ.App.—Dallas 1976, no writ). Such evidence may be considered "if it demonstrates that a condition affecting the individual's testamentary capacity was persistent and likely present at the time the will was executed." *Horton*, 965 S.W.2d at 85 (citing *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex.1983)).

We disagree with Charles that Dr. Scamardo and Dr. Newsome's testimony was no evidence of incapacity. In fact, we find their testimony the most compelling. Dr. Scamardo testified that Irene experienced "periods of incoherence" as early as 1987, and that she was incoherent "ninety-nine percent" of the time that she visited him for treatment. Dr. Scamardo flatly stated that Irene would not be able to "keep up with all the complicated dealings of making out a will, [and] dealing with business dealings." Dr. Newsome agreed. Dr. Newsome explained to the jury that Parkinson's Disease causes a degeneration of the brain that affects a patient's ability to think clearly and process information. He said that, in a normal patient, the medicine can cause hallucinations, confusion, and delirium. In Irene's case, her condition was probably worse because she abused the medication by taking more than was prescribed. Although he first examined Irene in 1992, Dr. Newsome reported that she had likely suffered from dementia for some time. Based on pharmacy records, Dr. Newsome said the following: he doubted that Irene knew "what planet" she was on when she signed the 1989 will; the lack of competency was not a "close question"; and "with reasonable medical certainty," he "firmly believe[d] that [Irene] did not have testamentary capacity" on August 17, 1989.

 The overall evidence supports the doctors' testimony.[3] In 1984, Irene was diagnosed with a serious, degenerative ill-

3. The doctors' testimony in this case is over- whelming evidence of incapacity. Thus,

ness. As a result of the illness, she changed. Parkinson's Disease is an illness that is progressive in nature, and its impact on individuals such as Irene, who are diagnosed later in life, can be more mental than physical. As noted previously, by 1984, Irene already had a history of over-medicating her physical and mental pain with prescription tranquilizers. After 1984, there was a dramatic change in Irene's social and spiritual attitudes and habits. Irene quit driving; she stopped going to church despite her previous high level of devotion; and she stopped seeing friends. There was also a change in her physical abilities and habits. She became unable to care for herself; she needed others to watch her while W.T. was at work. By 1987–88, when her daughter brushed her teeth for her, she acted like a child. By 1987, Irene was suffering from incoherence; in addition, her Parkinson's Disease had become "severe." Finally, and most importantly, Irene's granddaughter testified that she visited with Irene the afternoon of August 17, 1989, to talk with Irene about her impending wedding on August 21. Irene would not respond to anything. Her granddaughter said that Irene was "absolutely not" in a sound frame of mind on that day and was in that same condition "[m]ost of the time, and had been for awhile." This constitutes some evidence, in conjunction with the medical testimony, from which the jury could have logically inferred that Irene lacked testamentary capacity to execute a will on August 17, 1989. *See Jones*, 758 S.W.2d at 326–27. Therefore, we hold that the verdict was supported by legally sufficient evidence and overrule the challenge by Charles on that issue.

### D. Standard of Review: Factual Sufficiency

 Charles also argues that the evidence is factually insufficient to estab-lish that Irene lacked testamentary capacity on August 17, 1989. A party challenging a jury finding on an issue upon which he had the burden of proof must demonstrate that the adverse finding is "against the great weight and preponderance of the evidence." Hall, *Standards of Review*, 29 ST. MARY's L.J. at 485. When reviewing a complaint of factual insufficiency in this context, the reviewing court must first examine the record to determine if there is some evidence to support the finding and, if such is the case, then it must determine, in light of the entire record, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See id.* at 485–86; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (citing *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985) and *In Re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951)). Of course, the jury, as trier of fact, is the sole judge of the witnesses' credibility and of the weight given to their testimony. *See Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 213 (Tex.App.—Houston [14th Dist.] 1991, no writ). Because an appellate court is not a fact finder, we may not substitute our judgment for that of the jury's, "even if a different answer could be reached on the evidence." *Knox*, 992 S.W.2d at 50 (citing *Peter v. Ogden Ground Servs., Inc.*, 915 S.W.2d 648, 649 (Tex.App.—Houston [14th Dist.] 1996, no writ)). In that regard, the amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *See id.* (citing *Peter*, 915 S.W.2d at 650).

### E. Evidence Presented by Charles

 Charles argues in his brief that Irene was competent to execute a will on

---

while it is possible that Irene may have had a lucid moment, the great likelihood is that she was not competent on August 17, 1989. Although Charles complains that the doctors' testimony is "no evidence," that argument is misplaced. Our review looks at all of the evidence which, in this case, supports the testimony given by Dr. Scamardo and Dr. Newsome.

August 17, 1989, because she was "rational, knew her family, was aware of her surroundings, and was never confused or disoriented" on that date. At trial, Charles testified that, although Irene was diagnosed with Parkinson's Disease in 1984, he did not notice a decline in his mother's mental health until 1991, when she started "hallucinating." Charles was close to his mother and he helped to care for her. Charles had a house on the Bracewell property, and he visited her everyday unless he was out of town. Charles conceded that Irene was treated for "over medicating" herself, and that she had a variety of physical and mental or emotional problems, including anxiety, nervousness, arthritis, and a thyroid condition, in addition to Parkinson's Disease. Charles admitted further that, in 1989, his mother was taking a variety of medications for her medical problems, including Valium and Sinemet. Charles reported, however, Irene was able to walk, make coffee, and dress herself. According to Charles, Irene still recognized him in July of 1994, after she went to live in a nursing home. Charles testified that Irene asked him to prepare a power of attorney for her to sign, in July of 1989, and that he did so. Charles denied that he prepared the 1989 will signed by his mother. He admitted, however, that he did have to help his mother to execute the 1989 will by filling in the names of the individuals who witnessed her signature as well as the date on which it was signed.

In further support of his claim that Irene had the requisite testamentary capacity to execute the 1989 will, Charles points to trial testimony given by several "disinterested" witnesses who either worked for W.T. and Irene or visited Irene periodically. These witnesses testified that, at or near the time Irene signed the 1989 will, she knew her next of kin and had an understanding of the "general nature of things that were going on" around her. These witnesses also reported that Irene was capable of carrying on a rational conversation, that she did not appear delusional, and that "there was nothing wrong with her mind." Irene's older sister, who saw Irene on the day she executed the 1989 will, testified that she believed Irene was capable of making "good judgments" at that time.

Charles maintains that this evidence establishes that Irene had testamentary capacity on the day she signed the 1989 will. However, considering the testimony presented by Charles as a whole, it does not rise to the level of testamentary capacity under the governing standard set out above. W.T. presented specific testimony from Dr. Scamardo and Dr. Newsome that Irene was incoherent and would have been unable to "keep up with all the complicated dealings of making out a will," or "dealing with business dealings" on August 17, 1989, and that her lack of competency was not a "close question." The testimony proffered by Charles shows, at best, that Irene could respond rationally to conversation at or near the time she executed the 1989 will.

Charles also highlights certain facts which he contends are contradictory to the jury's finding that Irene lacked testamentary capacity. Charles points out that, at the trial, Grisset conceded that she was "interested" in the outcome of the lawsuit. Grisset admitted further that, when asked at her deposition which day of the week August 17, 1989 fell on, she was unable to remember. During his testimony, W.T. agreed that, in answers to an interrogatory requesting a list of persons "known to be in [his] home on August 17, 1989," no mention was made of Grisset's presence. W.T. also admitted that, on February 3, 1989, Irene executed a letter to her bank allowing W.T. to put her money into a CD, "cashable by Irene, Charles or W.T. Bracewell." W.T. claimed that he probably typed the letter for her because of her condition. According to W.T., Irene's left hand was paralyzed in 1989, and it was unlikely that she would have been able to type. Dr. Scamardo conceded that he did

not see Irene on the day the will was signed. He was also surprised to learn that Irene had executed a power of attorney form while in his office on July 25, 1989. Dr. Scamardo's nurse, who was not called as a witness, purportedly witnessed Irene's signature. Dr. Newsome testified that Irene was able to converse with him, "[i]ntermittently," in 1992. Dr. Newsome noted further that even a Parkinson's patient who was "confused and delirious" may have "some days where they are lucid" in addition to days when "they're very, very, confused." He admitted, therefore, that it was "possible" that Irene was oriented on August 17, 1989.

Notwithstanding the facts recited above, even Charles testified that his mother was experiencing incoherence in 1987, and that her Parkinson's Disease was progressing in severity at that time. Nell Halley, who witnessed the 1989 will, could only "assume" that Irene knew what she was doing when she signed the will because Irene did not discuss her plans. The voluminous medical records and the testimony given by Dr. Scamardo and Dr. Newsome also demonstrate that Irene was on "heavy duty medication" in 1989, and that she would not have been able to "keep up with all the complicated dealings of making out a will," or participate meaningfully "with business dealings" at that time. After reviewing all of the evidence, we do not consider the jury's finding so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we overrule Charles's factual sufficiency challenge.

### IV. Discussion—The 1975 Will

Charles contends that it was also error for the trial court to grant W.T.'s application to probate the 1975 will because "there is no evidence that it was executed with the formalities required by law." W.T. maintains that a proper application to probate the 1975 will was made under § 85 of the Texas Probate Code because the 1975 will was "self-proved." In the alternative, W.T. argues that "all necessary proof of execution was offered and received by the court" and, therefore, the requisite formalities were properly demonstrated at trial.

### A. Standard of Review: No Evidence

In deciding a "no evidence" issue, this Court may consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of that finding, and must disregard all contrary evidence and inferences. *See Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992) (citing *State v. $11,014.00,* 820 S.W.2d 783 (Tex.1991) and *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965)). If any evidence of probative force supports the finding, then we must overrule the issue and uphold the finding. *See Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied) (citing *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989)).

In this case, the jury was asked the following question with respect to the 1975 will's propriety:

Do you find from a preponderance of the evidence that the Will dated November 20, 1975 was executed with all of the formalities required by law to make a Will?

In response, the jury answered: "We do." Charles insists that there is "no evidence" to support this finding because there is "insufficient evidence" to show that the 1975 will was executed with the legal formalities required under § 84(b) of the Texas Probate Code. A true reading of § 84(b) shows that it applies only if the will is not self-proved. As discussed more fully below, because evidence in the record shows that the 1975 will was self-proved, under § 59 of the Texas Probate Code, the will comported with the provisions set out in § 84(a) of the Code, and a review of the formalities urged by Charles is not required here.

## B. Self–Proved Wills

■ It is undisputed that W.T. was able to produce only a photocopy of the 1975 will and that the original document was not admitted into evidence. Section 85 of the Texas Probate Code provides that a "written will which cannot be produced in court shall be proved in the same manner as provided" in § 84 of the Code. TEX. PROB.CODE. ANN. § 85 (Vernon 1980). Here, W.T. contends that his probate application was proper, under § 85, because the 1975 will was a "self-proved" document in the manner prescribed by § 84(a).

Section 84(a) of the Texas Probate Code states that "[i]f a will is self-proved as provided in this Code, no further proof of its execution with the formalities and solemnities and under the circumstances required to make it a valid will shall be necessary." TEX. PROB.CODE. ANN. § 84(a) (Vernon 1980). In Texas, a will is self-proved if it complies with § 59 of the Texas Probate Code, which provides as follows:

> Every last will and testament, except where otherwise provided by law, shall be in writing and signed by the testator in person or by another person for him by his direction and in his presence, and shall, if not wholly in the handwriting of the testator, be attested by two or more credible witnesses above the age of fourteen years who shall subscribe their names thereto in their own handwriting in the presence of the testator. Such a will or testament may, at the time of its execution or at any subsequent date during the lifetime of the testator and the witnesses, be made self-proved, and the testimony of the witnesses in the probate thereof may be made unnecessary, by the affidavits of the testator and the attesting witnesses, made before an officer authorized to administer oaths under the laws of this State. Provided that nothing shall require an affidavit or certificate of any testator or testatrix as a prerequisite to self-proof of a will or

testament other than the certificate set out below.

TEX. PROBATE CODE ANN. § 59(a) (Vernon 1980). In this case, W.T. testified that he and Irene signed the 1975 will in the offices of an attorney, Roger Knight, Sr., and that they also signed self-authenticating affidavits in the presence of two witnesses at that time. A review of the 1975 will shows that it contains a sworn, notarized affidavit which complies with § 59 of the Texas Probate Code.

■ Once a self-proved will is admitted into evidence, the proponent has *prima facie* established that the will was properly executed. *See Guthrie*, 934 S.W.2d at 829 (citing *James*, 573 S.W.2d at 288). Charles has presented no evidence, or argument, to rebut this *prima facie* showing. Accordingly, we overrule the "no evidence" challenge raised by Charles on this issue, and uphold the trial court's decision to grant W.T.'s application to probate the 1975 will.

## V. Discussion—Jury Charge Error

In his remaining issues, Charles claims that the trial court committed error by submitting questions to the jury on whether the wills executed in 1975 or 1989 were "true and valid" documents. A review of the jury charge shows that Question 2 asks as follows:

> Do you find from a preponderance of the evidence that the Will, dated August 17, 1989, is not the true and valid Will of IRENE L. BRACEWELL.

In response to this question, the jury answered: "We do." The remaining question in dispute, Question 4, contains the following similar language:

> Do you find from a preponderance of the evidence that the Will, dated November 20, 1975, is not the true and valid Will of IRENE L. BRACEWELL.

In response to this question, the jury answered: "We do not." Charles insists that Questions 2 and 4 were not properly submitted to the jury because "the only disputed and controlling issue was whether Irene had the testamentary capacity" to

execute the 1989 will. Charles complains further that Questions 2 and 4 are mixed questions of law and fact not suited for a jury's determination. For the reasons set out above, we have already concluded that the jury's finding that Irene lacked the requisite testamentary capacity to make the 1989 will was supported by sufficient evidence. The jury's determination that the 1975 will was properly executed was likewise supported by sufficient evidence and comported with proper legal standards. Therefore, the jury charge issues raised by Charles in this instance are moot, and we need not consider them.

## VI. Conclusion

In conclusion, we overrule the issue challenging the jury's finding that Irene lacked testamentary capacity to execute a valid will on August 17, 1989. We also overrule the issue regarding the trial court's decision to grant W.T.'s application to probate the 1975 will. Based on these rulings, the issues raised by Appellant with respect to Questions 2 and 4 in the jury charge are moot. Based on the foregoing, the judgment of the trial court is therefore affirmed.