

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-20-00391-CV

**IN THE ESTATE OF** Shirley L. **WIATREK**, Deceased

From the County Court, Karnes County, Texas
Trial Court No. PR-2019-0025
Honorable John D. Hutchinson, Judge Presiding[1]

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Luz Elena D. Chapa, Justice
               Beth Watkins, Justice
               Liza A. Rodriguez, Justice

Delivered and Filed: August 10, 2022

AFFIRMED

This appeal arises from a will contest between appellant Andrea Kotara White and appellee Wade Arledge. White argues the county court lacked jurisdiction to probate the contested will, and the evidence was legally and factually insufficient to support the county court's findings. We disagree and affirm the county court's final judgment in favor of Arledge.

### BACKGROUND

Before her death, Shirley L. Wiatrek was a party in a complex oil and gas lawsuit involving her mineral interests in Karnes County. During the litigation, a concern about her capacity arose, and a separate guardianship action was initiated. In that action, the county court determined Wiatrek partially incapacitated based on two certificates of medical examination concluding she

---

[1] Statutory Probate Judge, sitting by assignment

was unable to make complex business decisions without assistance. It also appointed Arledge, a lawyer, as permanent guardian of Wiatrek's estate.

As guardian, Arledge hired a new attorney to represent Wiatrek in the pending oil and gas litigation. The litigation ultimately concluded with Wiatrek receiving a substantial lump sum award, which was placed in the Karnes County court registry and distributed to Wiatrek's estate in monthly payments. Arledge also made several requests to the county court seeking authorization to make gifts and to take action on other estate planning matters. Pertinent to this appeal, he drafted a will for Wiatrek, which she executed on February 19, 2018. The will was witnessed by two witnesses and provided distributions to Phyllis and James Barnes, members of the Kotara side of Wiatrek's family. According to Arledge, after Wiatrek signed the will, Wiatrek's relationship with the Kotaras deteriorated, and she repeatedly told him she did not want any Kotaras inheriting her property.

In April 2019, Wiatrek fell outside her home and was hospitalized. On April 27, 2019, while at the hospital, Wiatrek executed a new will prepared by Arledge; this second will excluded Phyllis, James, and other Kotara family members, and it made distributions to multiple family members and charities. The hospital then discharged Wiatrek to a nursing care facility for additional treatment and care, and Arledge hired another attorney, Brent Free, to prepare a third will for Wiatrek to sign. According to Arledge, the second will had been prepared "in a big hurry," and he wanted to ensure Wiatrek's will accurately reflected her wishes. On May 2, 2019, while in the nursing facility, Wiatrek executed the third will, also drafted by Free (the "May 2, 2019 Will"). The May 2, 2019 Will made the same exclusions and distributions and established a trust. Arledge and Free made a video recording of the will execution ceremony.

On July 27, 2019, Wiatrek passed away, and Arledge filed an application to probate the May 2, 2019 Will in Karnes County. On August 26, 2019, the county court admitted the will to

probate and issued letters testamentary to Arledge as Independent Executor of Wiatrek's estate. The August 26, 2019 Order admitting the will to probate made all the required findings to admit the will to probate and found, among other findings, Wiatrek of sound mind on the will execution date and no objection to or contest of the will had been filed.

It was not until November 5, 2019, White, Phyllis's sister, filed a will contest asserting Wiatrek lacked testamentary capacity to execute the May 2, 2019 Will. A bench trial occurred, and the county court heard testimony from multiple fact witnesses, including White, Phyllis, James, Arledge, and an expert witness, Dr. Jason Schillerstrom. The court also considered forty-one exhibits, including the wills and the video recording of the May 2, 2019 Will execution ceremony. The county court ultimately found White failed to show Wiatrek lacked testamentary capacity and denied White's request to set aside the May 2, 2019 Will. The county court signed a final judgment on June 23, 2020 reflecting its order. This appeal followed.

### COUNTY COURT'S JURISDICTION TO ADMIT THE MAY 2, 2019 WILL TO PROBATE

White contends the county court lacked jurisdiction to probate the May 2, 2019 Will because Arledge did not comply with certain statutory notice and hearing requirements necessitated by the guardianship proceeding before Wiatrek executed the will. According to White, because Wiatrek was under a guardianship, chapter 1162 of the Texas Estates Code—specifically sections 1162.001, 1161.003, and 1162.007—required Arledge to provide notice of the hearing by certified mail to all devisees in Wiatrek's will and obtain the court's approval of the will after the hearing. White contends Arledge's failure to comply with these requirements constitutes a jurisdictional defect and requests we vacate the August 26, 2019 Order admitting the will to probate.

Arledge responds by arguing the statutory notice requirements outlined in chapter 1162 are not jurisdictional, and the county court had jurisdiction to admit the May 2, 2019 Will to probate.

Arledge contends White is framing the issue as jurisdictional because she waived her notice complaint by failing to raise it during the will contest trial. Arledge further contends White is now improperly collaterally attacking the August 26, 2019 Order that admitted the will to probate because she did not directly appeal that order.

Although White did not directly appeal the August 26, 2019 Order admitting the will to probate, we construe White's request to vacate that order as a challenge to only the portion of the June 23, 2020 final judgment that "ORDERED that the May 2, 2019 [Will] admitted to probate on August 2[6], 2019 will not be set aside." This is because the final judgment disposes of a will contest, and "[a] will contest is a direct attack on the order admitting a will to probate." *Stoll v. Henderson*, 285 S.W.3d 99, 105 (Tex. App.—Houston [1st Dist.] 2009, no pet.). According to the Texas Supreme Court, the purpose of a will contest is to provide a remedy to a person interested in challenging the failure to comply with either "those things essential under the statute to the making of a will" or "those requirements necessary to clothe the probate court with the power to make valid probate." *Id.* (quoting *Franks v. Chapman*, 61 Tex. 576 (Tex. 1884)) (internal quotations omitted). Here, White's argument falls within these categories because she is challenging the county court's power to probate the will, which she contends was not created in compliance with certain statutory requirements. *See id.* Therefore, Arledge's characterization of White's argument as an improper collateral attack on the order admitting the will to probate is misplaced.

Whether Arledge's failure to follow chapter 1162 constitutes a jurisdictional defect is a separate question. When a person is placed under a guardianship, chapter 1162 of the Texas Estates Code authorizes the probate court to enter an order allowing a guardian to establish an estate plan designed to minimize taxes for a ward. *See* TEX. EST. CODE ANN. § 1162.001. Specifically, it states the probate court may enter such an order "[o]n application of the guardian

of the estate or any interested person, after the posting of notice and hearing, and on a showing that the ward will probably remain incapacitated during the ward's lifetime." *Id.* A person who makes such an application "shall mail notice of the application by certified mail" to all devisees under an instrument concerning the ward's estate, the ward's spouse and dependents, and any other person the court directs. *Id*. § 1162.003. Ten days after complying with this notice requirement, an applicant may request a hearing to be held, and notice of the hearing must be given to certain outlined individuals. *Id.* § 1162.007(a).

We are aware of no caselaw applying these notice requirements to either a probate proceeding involving the admission of a will to probate or a will contest, and White does not point us to any such authority. Nonetheless, assuming these provisions apply to this case, we find our analysis in *Hailey v. Paduh* persuasive in determining the jurisdictional impact of when a guardian fails to strictly comply with these requirements. *See* No. 04-12-00823-CV, 2014 WL 1871334 (Tex. App.—San Antonio May 7, 2014, no pet.) (mem. op.).

There, Joseph Paduh III sought to set aside a probate court order appointing Joel M. Hailey as guardian by arguing Hailey failed to comply with the notice requirements relating to the guardianship proceedings. *Id*. at *1-*4, *8. According to Paduh, Hailey's failure to comply with certain statutory notice requirements deprived the probate court of jurisdiction and therefore, the order appointing Hailey as guardian and all subsequent orders were invalid. *Id.* at *3. We applied an analytical framework set out by the Texas Supreme Court and held the statutory notice requirements were not jurisdictional. *Id*. at *10-*11 (following framework outlined in *In re Guardianship of V.A.*, 390 S.W.3d 414 (Tex. App.—San Antonio 2012, pet. denied) and *City of DeSoto v. White*, 288 S.W.3d 389 (Tex. 2009)). After considering the plain language of the pertinent sections, we held there was nothing in them suggesting the legislature intended notice to be a jurisdictional requirement. *Id.* at *11. We further analyzed the sections to determine if they

included "any consequence language with regard to a failure to comply," determined they did not, and reasoned the consequence of holding the notice requirement to be nonjurisdictional was *de minimis*. *Id*.

In addition to our analysis in *Hailey*, we remain mindful to "analyze a statutory provision under the presumption that the legislature did not intend to make the provision jurisdictional." *V.A.*, 390 S.W.3d at 418. And "the fact that a statute's requirements are mandatory does not, by itself, make the requirements jurisdictional." *Id*. Turning to the plain language of the sections cited by White, section 1162.001's use of the word "may" indicates the probate court has discretion to authorize a guardian to create an estate plan for a ward when certain requirements are followed. *See* TEX. GOV'T CODE ANN. § 311.016(1) (providing "may" creates discretionary authority). Similarly, section 1162.007's use of the word "may" gives the applicant the discretion to request a hearing held on his application. *See id.* However, section 1162.003 uses the phrase "shall," indicating notice by certified mail of the application is mandatory. *Id.* § 311.016(2) (defining "shall" imposes a duty). Despite section 1162.003's mandatory language, there is nothing in chapter 1162 indicating a legislative intent to make these notice and hearing requirements jurisdictional. *See V.A.*, 390 S.W.3d at 418. Additionally, this chapter does not outline any specific consequences in the event notice is not given or a hearing does not take place. The consequence of categorizing these requirements as nonjurisdictional is *de minimis* given White had the opportunity to contest the will's validity based on these alleged deficiencies during the will contest. *See Hailey*, 2014 WL 1871334, at *11 (reasoning consequence of holding notice requirement to be nonjurisdictional to be *de minimis* because party could have contested proceeding); *see also V.A.*, 390 S.W.3d at 420 (explaining consequences of finding notice requirements jurisdictional was far-reaching because it would subject guardianship to ongoing attack by persons unconcerned with ward). She did not. Accordingly, we hold chapter 1162's notice and hearing requirements

are not jurisdictional, and any failure to follow such requirements did not deprive the county court of jurisdiction to admit the May 2, 2019 Will to probate. We therefore overrule White's jurisdictional complaint.

### SUFFICIENCY OF THE EVIDENCE

White next asserts two sufficiency arguments relating to Wiatrek's testamentary capacity. White first argues the evidence is legally and factually insufficient to support the county court's finding the May 2, 2019 Will was admitted to probate. According to White, there is a presumption a ward lacks testamentary capacity, and this presumption applied to Wiatrek because she was under a guardianship when she executed the May 2, 2019 Will. White asserts Arledge failed to rebut this presumption when probating the will, and therefore, we should vacate the August 26, 2019 Order admitting the will to probate. White further asserts the evidence was legally and factually sufficient to establish Wiatrek lacked testamentary capacity on the day she executed the May 2, 2019 Will, and as a result, the county court erred by finding White did not meet her burden of proof on lack of testamentary capacity.

In response, Arledge argues White waived her first sufficiency challenge regarding the presumption applying to a ward because White failed to appeal the August 26, 2019 Order admitting the will to probate. Arledge further argues even if we consider White's first sufficiency challenge, Arledge rebutted the presumption by establishing a prima facie case of testamentary capacity and proper execution at the time the will was admitted to probate. As to White's second sufficiency challenge, Arledge contends White failed to meet her burden of proof and legally and factually sufficient evidence existed to show Wiatrek possessed testamentary capacity on the day she executed the May 2, 2019 Will.

*Standard of Review*

"A probate court's findings are reviewable for legal and factual sufficiency by the same standards applied in reviewing evidence supporting a jury's answer." *Est. of Bedell*, No. 04-14-00564-CV, 2016 WL 416374, at *2 (Tex. App.—San Antonio Feb. 3, 2016, pet. denied) (mem. op.). When, as in this case, "an appellant attacks the legal sufficiency of an adverse fact finding on an issue for which [s]he had the burden of proof, [s]he must demonstrate on appeal that the evidence established that issue as a matter of law." *Bracewell v. Bracewell*, 20 S.W.3d 14, 18 (Tex. App.—Houston [14th Dist.] Feb. 24, 2000, no pet.) (internal quotation marks omitted). We examine the record for evidence supporting the finding and disregard contrary evidence and inferences. *Id.* If the record contains no evidence to support the finding, then we examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.*

When an appellant attacks the factual sufficiency of an adverse finding on which she had the burden of proof, she must demonstrate "the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Est. of Finney*, 424 S.W.3d 608, 623 (Tex. App.—Dallas 2013, no pet.). We will set aside the finding "only if it is so contrary to the overwhelming weight of the evidence." *Finney*, 424 S.W.3d at 623.

In conducting our sufficiency review, we remain mindful the factfinder is the sole judge of the credibility of the witnesses and weight given to their testimony. *Id.* And we may not substitute our judgment for the factfinder's judgment or pass on the credibility of the witnesses. *Id.*

*Applicable Law*

Once a will is admitted to probate, the will contestant bears the burden of establishing the will was not properly executed and the testator did not have testamentary capacity. *See, e.g., Est. of Koontz*, No. 04-15-00820-CV, 2016 WL 6775593, at *2 (Tex. App.—San Antonio Nov. 16,

2016, no pet.); *Est. of Coleman*, 360 S.W.3d 606, 611 (Tex. App.—El Paso 2011, no pet.). "A testator has testamentary capacity when [s]he has sufficient mental ability to understand [s]he is making a will, the effect of making a will, and the general nature and extent of h[er] property." *Koontz*, 2016 WL 6775593, at *2. "The testator also must know h[er] next of kin and the natural objects of h[er] bounty, the claims upon them, and have sufficient memory to collect in h[er] mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them." *Id.* "The pivotal issue is whether the testator had testamentary capacity on the day the will was executed." *Id.*

However, evidence establishing the testator's incapacity at other times is probative, if it demonstrates a condition affecting her capacity persisted and was likely present at the time the will was executed. *Id.* For a will contestant to successfully challenge a testator's capacity with circumstantial evidence from time periods, other than the day on which the will was executed, the will contestant must show: (1) "the evidence offered indicates a lack of testamentary capacity"; (2) "the evidence is probative of the testator's capacity (or lack thereof) on the day the will was executed"; and (3) "the evidence provided is of a satisfactory and convincing character." *Est. of Mahaffey*, No. 04-19-00122-CV, 2019 WL 7196618, at *4 (Tex. App.—San Antonio Dec. 27, 2019, no pet.) (mem. op.) (quoting *In re Est. of Graham*, 69 S.W.3d 598, 606 (Tex. App.—Corpus Christi-Edinburg 2001, no pet.)) (internal quotation marks omitted).

Texas courts have also recognized "a testator under a guardianship is not necessarily incompetent to make a will." *Evans v. Allen*, 358 S.W.3d 358, 367–68 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (internal quotations omitted). As White points out, when the facts show a testator was under a guardianship at the time she executed a will, then a presumption indicating she lacked testamentary capacity is created. *Id.* at 368. This presumption "is not conclusive and may be rebutted with evidence that the testator had testamentary capacity on the day that [s]he

executed the will." *Id*. Accordingly, "[a] guardianship determination is relevant to the question of testamentary capacity, but it does not follow that a testator automatically lacks testamentary capacity after a court places the testator under a guardianship." *Id.*

*Application*

Here, the county court entered a finding stating: "The Last Will and Testament of Shirley L. Wiatrek, signed May 2, 2019, was admitted to probate by Order Admitting to Probate and Authorizing Letters Testamentary on August 26, 2019." This finding is supported by the August 26, 2019 Order admitting the will to probate, which was admitted into evidence at the will contest trial. White challenges this finding by arguing Arledge failed to rebut the presumption that Wiatrek lacked capacity because she was a ward when she executed her will. According to White, "[Arledge] had to establish at the time the [May 2, 2019] Will was probated that this presumption was rebutted."

White's argument is misplaced. This appeal arises out of a will contest, and as the will contestant, White bore the burden to establish the will should not have been admitted to probate. *See Koontz*, 2016 WL 6775593, at *2. At the trial, White did not object to the August 26, 2019 Order admitting the will to probate, and she did not present any evidence showing either Arledge failed to rebut this presumption or the county court improperly admitted the will to probate. Instead, the evidence conclusively established Arledge properly met the requirements necessary to probate the will. We therefore overrule White's first sufficiency challenge.

Turning to White's second sufficiency argument, White did not present any direct evidence indicating Wiatrek lacked testamentary capacity. Instead, White points to the fact Wiatrek was under a guardianship at the time she executed the May 2, 2019 Will. She also points to experiences she, Phyllis, and James had with Wiatrek when Wiatrek lived with Phyllis and James. There is no dispute Wiatrek was a ward when she signed the will. It is also undisputed Wiatrek lived with

Phyllis and James in November 2017 when she started receiving chemotherapy treatments. According to White, Phyllis, and James, Wiatrek was delusional. Phyllis testified Wiatrek "liked to put herself in a dream world," and she would tell the family she was going to places like Alaska, Hawaii, or Africa. Phyllis testified sometimes Wiatrek pretended to talk on her cell phone. James also testified Wiatrek told him imaginary things while living with them, and he "sort of just went along with it."

White also points out there was evidence Wiatrek could not operate simple appliances when she was living by herself in 2018. The record shows after Wiatrek stopped receiving chemotherapy treatments, she moved out of Phyllis and James's home and into a new RV on her property. According to White, Wiatrek became upset with her and Phyllis when they tried to show her how to use the RV refrigerator, and it appeared Wiatrek did not know how to use the stove, even though she loved to cook. James also testified Wiatrek had trouble understanding how to use the refrigerator and stove when she lived in the RV.

In addition to White's evidence, the trial court heard the testimony from Arledge describing Wiatrek on the day she executed the May 2, 2019 Will. Arledge testified he was present for the will signing, and when specifically asked whether Wiatrek understood what she was doing, the nature of her property, and the effect of her signing, Arledge testified "yes" and "absolutely." He added she knew who her next of kin were and exactly who she wanted and did not want in the will. He testified "she was really still mad at Phyllis and Boo Boo [Phyllis's husband, James] . . . and they're mentioned in the will that I wrote that she wanted to exclude them."

When asked to explain how it was possible for Wiatrek to have testamentary capacity while a patient in the nursing care facility, Arledge answered her mental state was fine and "she knew exactly what was . . . I wouldn't have done her will if she didn't know what we were doing." He further explained the facility was providing her with physical rehabilitation due to her fall. He

testified "[s]he was okay mentally . . . she just couldn't walk. She wasn't in pain, but she could never get back up." He further clarified Wiatrek was not receiving chemotherapy treatments or on hospice on the date of the will execution.

Arledge also provided testimony describing Wiatrek in the years leading up to the execution of the May 2, 2019 Will. He testified Wiatrek did not have trouble managing her monthly finances, and as her guardian, he monitored her spending, observed how she frugally managed her monthly allowance and paid her bills, and consulted with her when she made certain purchases. He stated in February 2018, he drafted a will for Wiatrek because at that time, she understood who her next of kin was and the effect of making the will. He explained that after she signed this first will, "[s]omething happened," causing Wiatrek to become upset with the Kotaras. Arledge testified beginning in October 2018, Wiatrek sent him a series of letters and text messages, all of which were admitted into evidence. In these messages, Wiatrek started making changes to her will, and she specified the people and charities she wanted to gift property and who to remove as beneficiaries from her first will. One of these text messages stated, "no Kotaras. I'm fed up." Arledge explained based on Wiatrek's messages, he prepared a list of beneficiaries for Wiatrek to review, and as late as April 11, 2019, Wiatrek was reviewing this list.

Arledge testified later that month, he was unable to reach Wiatrek, so he drove to her house, where he found she had fallen outside. Arledge stated she was "perfectly lucid," but "real weak" because she had been lying outside for almost two days. Arledge continued, explaining after Wiatrek was admitted to the hospital, he drafted an updated will based on then recent conversations, and he had Wiatrek sign it at the hospital. He further added because he "did it in a big hurry," he discussed it with Free, another lawyer, and they set up another will signing at the nursing home. This will—the May 2, 2019 Will—was "a little bit different in terms—but not substantially different" and according to Arledge, Wiatrek had the capacity to understand it.

The trial court also heard testimony from Kaitlin Free, an attorney who testified she worked with Free and went with him to the will execution ceremony to act as a witness. According to Kaitlin, Wiatrek appeared lucid and understood the provisions of her will. On cross-examination, she elaborated Free discussed the will in detail with Wiatrek before she signed it, and it was clear Wiatrek understood what she was doing. Kaitlin testified Wiatrek named three people she specifically wanted excluded from the will, and she went on to recite "what year it was," "who the president was," and "her address."

In addition to this live eyewitness testimony, the trial court was presented with the video recording of Wiatrek's will execution ceremony. The video is approximately fourteen minutes long and shows Free explaining legal terms and each of the provisions of the will to Wiatrek as she is lying partially upright. Wiatrek appears fully engaged as Free explains the will. Throughout the conversation, Wiatrek confirms certain provisions, asks for various clarification, and expresses approval. At one point, she is specifically asked whether she intended to omit certain individuals, and as she shakes her head in agreement, she responds, "I don't want that family, the Kotara family, they're calling me and texting me, and I don't even answer."

The trial court further heard testimony from Dr. Jason Schillerstrom, a geriatric psychiatrist and university professor who had performed an assessment on Wiatrek for the guardianship proceeding. Dr. Schillerstrom testified he had an opportunity to review the video recording of the May 2, 2019 Will signing or execution, and he opined Wiatrek was alert, verbal, and capable of abstract thought. He testified based on what he observed, it appeared she understood the nature and extent of her property and the effect of the disposition of her property. He further testified it was clear "[s]he absolutely knew she was making a will" and she seemed to understand the effects of her acts. He concluded it was his opinion Wiatrek had testamentary capacity on May 2, 2019.

Accordingly, based on this evidence, we conclude White's evidence is not probative of Wiatrek's capacity on the day the May 2, 2019 Will was executed because it does not demonstrate whether a condition persisted affecting her capacity or was present on May 2, 2019. *See Koontz*, 2016 WL 6775593, at*2. White did not meet her burden to establish Wiatrek lacked testamentary capacity as a matter of law, and legally sufficient evidence supported the county court's finding Wiatrek possessed testamentary capacity. *See id.*; *Bracewell*, 20 S.W.3d at 18. We further conclude White did not demonstrate this finding was so against the great weight and preponderance of the evidence to be clearly wrong or unjust. *See Dow Chem.*, 46 S.W.3d at 242; *Finney*, 424 S.W.3d at 623. Accordingly, we further hold factually sufficient evidence supports the finding.

## ATTORNEY'S FEES

Finally, Arledge filed a notice of cross-appeal challenging the final judgment to the extent it denied his request for reasonable attorney's fees. In his brief, Arledge waives this issue; we, therefore, overrule it.

## CONCLUSION

Based on the foregoing, we affirm the county court's final judgment.

Luz Elena D. Chapa, Justice