NUMBER 13-02-350-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG
___________________________________________________________________

IN RE: THE ESTATE OF VELMA LEE ROBINSON, DECEASED
___________________________________________________________________

On appeal from the County Court of Jackson County, Texas.
__________________________________________________________________

O P I N I O N

Before Justices Rodriguez, Castillo, and Wittig



Opinion by Justice Rodriguez

         This is a will contest. Appellees, Velma Lee and John Harvey Robinson
Charitable Foundation (Foundation), Fannie Merle Welch, Elaine Moore, Bobbie Byrom,
Jerry Guffey, Mary H. Thedford


 and, alternatively, Joe Webb and M. H. "Buddy"
Brock, both as directors of the Foundation, contested the probate of a will executed
by Robinson in 1995 (1995 Will) in favor of a will she executed in 1983 (1983 Will). 
Appellees alleged that Velma Lee Robinson lacked testamentary and mental capacity
and was unduly influenced. A jury found that Robinson lacked testamentary capacity
to execute the 1995 Will and lacked mental capacity to execute numerous estate-planning documents. It also found that Robinson had been unduly influenced. The
jury returned a verdict in favor of appellees. Based on the jury's findings, the trial
court entered a judgment vacating its order that admitted the 1995 Will to probate. 
The trial court also set aside related estate-planning documents.
         By nine issues, appellants, Anna Marie Ayers and Derace Lee Ayers, Robinson's
sister and nephew, respectively, who had been appointed co-independent executors
of the Robinson estate and co-trustees of the Robinson living trust under the 1995
Will, complain of the following: (1) admission of expert witness testimony; (2)
sufficiency of the evidence to support findings of lack of testamentary or mental
capacity, undue influence, and agency; (3) joinder of the Foundation; (4) exclusion of
evidence regarding the dissolution and revival of the Foundation; (5) charge error; and
(6) failure to dismiss claims allegedly barred by limitations. We affirm.
I. Factual Background
         Robinson's estate consisted primarily of her Jackson County ranch. Robinson
had several foster children, but no biological children of her own.


 Robinson was
active in her church and gave generously during her life to numerous charities,
including the San Marcos Baptist Academy (SMBA) and the South Texas Children's
Home (STCH).
         In 1980 Robinson executed a will (1980 Will) leaving most of her estate to the
SMBA and the STCH. The 1980 Will also provided sizable bequests to family
members and close friends. In June 1983, Robinson executed a handwritten will
removing SMBA as a beneficiary. On October 28, 1983, Robinson executed the 1983
Will.


 In that will she left the majority of her estate to the Foundation.


 The 1983 Will
also left large bequests to the Pooles and the Wootans, Robinson's good friends and
long-time ranch managers; lifetime incomes to her sister Anna and her brother Cliff,
who predeceased Robinson; and cash bequests to her nieces, nephews, and friends. 
However, the 1983 Will again excluded SMBA and, this time, removed STCH as a
beneficiary. Robinson continued, however, to make gifts to SMBA and STCH as well
as other charities, to her friends, and to members of her family. She also continued
to fund the Foundation and direct to whom its annual gifts were to be given.
         In 1994, however, Robinson stopped funding the Foundation. On February 25,
1995, Robinson signed a second codicil to her 1983 Will. This codicil reduced the
gifts to her foster daughters and named Anna and Derace Ayers and Walton Donald
Cavitt, another nephew, as independent co-executors. Her assets still went to the
Foundation. Also in February 1995, Robinson signed a remove/replace resolution,
apparently to remove the directors of the Foundation, including Thedford and B.J.
Taylor, and replace them with Anna and Derace Ayers, and Cavitt.
         On August 14, 1995, Robinson executed estate-planning documents wherein
the estate would be divided upon her death among her relatives, primarily her nieces
and nephews, not among her charities. These interests would pass through the 1995
Will, a pour-over will. Under this will, Robinson's sister, Anna Ayers, received the
same bequest as under the 1983 Will. Anna and Derace Ayers were named as
independent co-executors of the 1995 Will. During the summer of 1996, without
being informed she had been removed as a director, Thedford was asked to distribute
all funds remaining in the Foundation.
         In May 1996, nine months after she executed her 1995 Will, Robinson suffered
a stroke. She suffered a second stroke in July 1996. On December 20, 1996, the
dissolution resolution and articles of dissolution were filed, and a certificate of
dissolution for the Foundation was obtained. Robinson had a third stroke in November
1997. She then left her ranch and moved into town. Robinson died on October 30,
1998 at the age of ninety-five.II. Procedural Background
         The 1995 Will was admitted to probate on December 8, 1998. On February 24,
2000, SMBA and STCH, beneficiaries named in a 1980 Will, sought to probate the
1980 Will and to set aside the order admitting the 1995 Will to probate. After learning
that a later 1983 Will existed that left the bulk of Robinson's estate to the Foundation,
Webb and Brock, as newly elected directors of the Foundation, sued Robinson's family
and filed an application to probate the 1983 Will. In October 2000, a third amended
petition was filed naming the Foundation as the lead plaintiff and withdrawing SMBA
and STCH as contestants in the lawsuit. The Foundation was later joined by
contestants Welch, Moore, Byrom, Jerry Guffy, and Thedford. The first trial ended in
a mistrial when the jury was unable to reach a verdict.
         On April 10, 2002, at the end of the second trial, the jury returned a verdict for
appellees, finding Robinson lacked the testamentary capacity to execute the 1995 Will
and the mental capacity to execute related estate documents. The jury also found that
Robinson had been unduly influenced. On May 13, 2002, the trial court rescinded and
set aside its order admitting the 1995 Will to probate and denied probate of the 1995
Will and of a second codicil to the 1995 Will. The court removed Anna and Derace
Ayers as independent co-executors and ordered all assets of the estate delivered to
Thedford upon her qualification as independent executor of the estate. The court also
declared numerous estate-planning documents invalid and set them aside.


 By a
separate order, the trial court ordered that the 1983 Will be admitted to probate as
Robinson's valid last will and testament.


III. Testamentary and Mental Capacity
         By their first three issues, appellants generally contend that appellees failed to
carry their burden of proving Robinson lacked testamentary and mental capacity. 
A. Expert Testimony
         In the first issue, appellants challenge the admission of expert testimony. They
contend the trial court erred in failing to exclude the testimony of James B. Grigson,
M.D., appellees' expert witness.
1. Preservation
         Before addressing appellants' substantive arguments on this issue, we must
determine whether it has been preserved for our review. Appellees assert that
appellants waived this challenge because their objections were not timely raised in the
trial court. Objections to testimony, including the qualifications of experts and the
reliability of their theories and methodology, must be raised at the trial court level, and
failure to do so waives any error on those grounds. Tex. R. App. P. 33.1(a);
Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002) (citing Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 409-11 (Tex. 1998)).
         In the first trial of this case, appellants filed a motion to exclude the expert
testimony of Dr. Grigson on the basis that his testimony was unreliable. On July 17,
2001 the trial court overruled that motion in open court stating "On the 'Robinson –
in quotes – Motion.' It relates to Dr. Grigson. I'm going to overrule the motion to
exclude the expert testimony of Dr. Grigson." The first trial ended in a mistrial and,
thus, returned the case to the posture it had been in before trial. See Wiley v. Joiner,
223 S.W.2d 539, 542-43 (Tex. Civ. App.–Fort Worth 1949, no writ) (mistrial is same
as if no trial has taken place); see also Cortimeglia v. Herron, 281 S.W.305, 306 (Tex.
Civ. App.–Waco 1925, writ ref'd) (mistrial is termination of trial before judgment, not
grant of new trial).
         During the second trial, Dr. Grigson again was called to testify. Without
objection, he testified as to his qualifications. Also without objection, Dr. Grigson
presented a general medical discussion and a recital of Robinson's physical condition
as revealed in her medical records. However, before Dr. Grigson offered his opinions
regarding Robinson's testamentary capacity and mental capacity, appellants renewed
their motion to exclude Dr. Grigson's testimony; testimony they claimed was
unreliable. The trial court overruled the motion without specifying what analysis it
applied in assessing the reliability of the testimony.
         Appellants' objection to the reliability of Dr. Grigson's testimony, made in the
form of their motion to exclude, was timely, its basis was clear, and a ruling was made
by the trial court. See Tex. R. App. P. § 33.1(a); Guadalupe-Blanco River Auth., 77
S.W.3d at 807. Thus, appellant preserved this challenge for our review.
2. Admissibility of Dr. Grigson's Testimony
         Having concluded that this issue has been preserved for our review, we now
address appellants' contentions regarding the admission of Dr. Grigson's testimony. 
On appeal, appellants do not challenge Dr. Grigson's qualifications.


 Instead,
appellants contend that his testimony is scientifically unreliable because neither the
Robinson factors, see E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549,
557 (Tex. 1995), nor the Gammill analytical-gap test was satisfied. See Gammill v.
Jack Williams Chevrolet, 972 S.W.2d 713, 726 (Tex. 1998).
a. Reliability
         Rule 702 of the Texas Rules of Evidence permits a witness qualified as an
expert by knowledge, skill, experience, training, or education to testify on scientific,
technical, or other specialized subjects if the testimony would assist the fact finder in
understanding the evidence or determining a fact issue. Tex. R. Evid. 702. A two-part
test governs whether expert testimony is admissible: (1) the expert must be qualified;
and (2) the testimony must be relevant and based on a reliable foundation. Id.;
Robinson, 923 S.W.2d at 556 (adopting Daubert v. Merrell Dow Pharms., Inc., 509
U.S. 579, 591-92 (1993)). When reliability of an expert's testimony is challenged, the
trial court must "evaluate the methods, analysis, and principles relied upon in reaching
the opinion . . . [in order to] ensure that the opinion comports with applicable
professional standards outside the courtroom." Tamez v. Mack Trucks, Inc., 100
S.W.3d 549, 555 (Tex. App.–Corpus Christi 2003, no pet.) (quoting Gammill, 972
S.W.2d at 725-26). The proponent of the expert testimony bears the burden of
demonstrating that the expert's opinion is reliable. Tex. R. Evid. 104(a), 702; Kerr-McGee Corp. v. Helton, No. 02-0356, 2004 Tex. LEXIS 63, at *21, Jan. 30, 2004
(Tex. 2004); Robinson, 923 S.W.2d at 557.
         In Robinson, the supreme court identified six nonexclusive factors to aid courts
in determining whether scientific testimony is reliable.


 Robinson, 923 S.W.2d at 557. 
However, these factors affecting reliability are not applicable to all expert testimony. 
Gammill, 972 S.W.2d at 726. For such instances, the supreme court adopted an
"analytical-gap" analysis. Id. The trial court must determine whether there may be
"simply too great an analytical gap between the data and the opinion proffered" for the
opinion to be reliable. Id.; see Tamez, 100 S.W.3d at 555.
b. Standard of Review
         The admission or exclusion of evidence is within the trial court's sound
discretion. Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex.
1998). "On appeal, we review a trial court's evidentiary decisions by an abuse of
discretion standard." Nat'l Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527-28
(Tex. 2000). When an expert's testimony lacks a reliable scientific basis, the trial
court abuses its discretion by admitting it. Ford Motor Co. v. Aguiniga, 9 S.W.3d 252,
262 (Tex. App.–San Antonio 1999, pet. denied). However, a reviewing court cannot
conclude that a trial court abused its discretion if, under the same circumstance, it
would have ruled differently or if the trial court committed a mere error in judgment. 
Robinson, 923 S.W.2d at 558. Instead, the test is whether the trial court acted
without reference to any guiding rules or principles; in other words, whether the act
was arbitrary and unreasonable. Id.
c. Analysis
         Dr. Grigson's opinion that Robinson lacked testamentary and mental capacity
on the day the contested will and other documents were signed was based on his
review of Robinson's medical records. Appellants do not contend that this
foundational data underlying Dr. Grigson's opinion testimony is unreliable.


 Rather,
they contend there is a gap between the evidence and Dr. Grigson's conclusion; that
nothing more was offered to justify his methodology other than his "say so."
         Dr. Grigson testified he had approximately twenty years experience as a forensic
psychiatrist and handled approximately twenty-five civil cases a year, including a 
number of cases involving will and trust contests. He also testified that he worked on
competency matters in criminal cases. Dr. Grigson explained that when he reviews
medical records in a will contest he is looking "[f]or information . . . to see how the
person's functioning, what's happening to them, what type of illnesses they've had,
how it affects them, primarily how they're functioning." Robinson's medical
conditions identified by Dr. Grigson as significant to his opinion included high blood
pressure in 1991; dizziness and weakness; a diagnosis of hypertensive cardiovascular
disease; a balance problem in 1992; edema; shortness of breath in 1993; use of a
wheelchair and oxygen; tiredness; nausea, vomiting, continued dizziness, feeling cold
and clammy and a history of peripheral vascular disease in 1994; congestive heart
failure; and a fairly low-grade heart murmur in 1990 that became much louder in 1994. 
Dr. Grigson also factored in a radiologist's report from a May 15, 1996 CT brain scan
that was taken when Robinson suffered a stroke approximately nine months after
signing the 1995 Will. The scan showed that Robinson had moderately severe atrophy
which was worse over the frontal lobe and the temporal lobe of the cerebral cortex. 
It also revealed Robinson had suffered an earlier stroke in the basal ganglia and in the
left occipital lobe. Although the earlier stroke was not recent, it could not be
determined when it occurred. Additionally, Dr. Grigson considered a psychological
assessment completed in May 1996. Of significance to him were the entries of a
history of atherosclerotic heart disease,


 high blood pressure, arthritis, and congestive
heart failure. An entry indicating a history of frequent falling was also important
because, as Dr. Grigson explained, when elderly individuals start getting hardening of
the arteries they begin falling due to insufficient blood supply to the cerebellar part of
the brain that coordinates all voluntary movements. The medical records further
revealed that Robinson had two subsequent strokes and was diagnosed with
atherosclerotic heart disease. In 1998, Robinson had a second brain scan that showed
the atrophy had progressed to severe diffuse atrophy.
         According to Dr. Grigson, Robinson's medical record entries showed there was
a progression of a pathological disease process that was causing Robinson to lose
brain cells. Dr. Grigson testified as to how the brain functions and the effect of
strokes, high blood pressure, and atherosclerotic heart disease on the brain. The 1998
scan showed severe diffuse atrophy, thus establishing a growth pattern from at least
moderate atrophy of the brain in 1996 to severe atrophy in 1998. Dr. Grigson
testified that this impairment was brought about by the basic disease process and had
taken a long time to develop. He also testified that the stroke was a result of
hardening of the arteries, a disease process that had been going on for years. Dr.
Grigson concluded Robinson had poor memory long before she had the stroke, again,
due to hardening of the arteries.
         Dr. Grigson acknowledged that Robinson could have been aware she owned
land and had cattle, oil and gas leases, hunting leases, and rice fields on the land, and
he assumed she could have recognized long-time family members. Nonetheless, based
on his understanding of testamentary capacity and on Robinson's past and on-going
physical and mental conditions, in Dr. Grigson's opinion, Robinson did not have
testamentary capacity when she signed the will on August 14, 1995. After setting
out his understanding of the mental capacity required to sign a contract or deed, Dr.
Grigson further testified Robinson did not have sufficient mental capacity to execute
the trust and partnership agreements on that same date.
         While Dr. Grigson's analysis of the medical records in this case involves the
application of scientific principals, it is not pure science. This methodology is not
easily tested by objective criteria, such as identifiable scientific formulas. Cf. Tamez,
100 S.W.3d at 555-56. Because Dr. Grigson's opinion is based largely on the
application of his knowledge, training, and experience to the underlying data, the
analytic gap analysis rather than the Robinson factors applies.
         In this case, the trial court, using the analytical-gap analysis, could have
concluded Dr. Grigson's medical experience and knowledge, coupled with his
testimony about the methodology he employed in reviewing the medical records,
demonstrate that the opinions he drew from the underlying medical records are
reliable. See Gammill, 972 S.W.2d at 726. Thus, we conclude the trial court did not
abuse its discretion by admitting Dr. Grigson's testimony. See Allen, 15 S.W.3d at
527-28.
d. Sitters' Notes
         Appellants also contend the trial court erred in overruling their objections to Dr.
Grigson's testimony regarding notes taken by Robinson's sitters. During redirect
examination, Dr. Grigson confirmed that several entries from notes taken by
Robinson's care givers supported his opinion. The trial court overruled appellants'
objections to Dr. Grigson's testimony regarding the notes and to the admission of the
excerpts of the notes to which he referred.
         "A party is free to support his opinion testimony of an expert by proof of facts
which tend to show its accuracy. . . ." Parkway Hosp., Inc. v. Lee, 946 S.W.2d 580,
586 (Tex. App.–Houston [14th Dist.] 1997, writ den'd). On redirect, Dr. Grigson was
asked to review specific entries from the sitters' notes to determine whether they
comported with his expert opinion. Dr. Grigson testified he reviewed these excerpts
for the first time during trial and that his opinion remained unchanged. He was not
asked to give new opinions based on the sitters' notes. The notes did, however,
confirm Dr. Grigson's assessment. See id.
         Appellants assert, nonetheless, that the admission of this testimony was
unexpected and deprived them of a fair opportunity to prepare a cross-examination of
Dr. Grigson. However, appellants were aware of Dr. Grigson's opinion and that it was
based on Robinson's medical records, not on the sitters' notes. It is undisputed that
appellants produced the sitters' notes to appellees during discovery and that they
knew the content of the notes. Furthermore, at his deposition, when asked whether
the sitters' notes formed the basis of his opinion, Dr. Grigson replied they did not; that
only the medical records provided the basis for his opinion. Dr. Grigson added,
however, that "if those [sitters' notes were] supplied to [him] at a later period of time,
they may reinforce [his] opinion or they may cause [him] to doubt [his] opinion." Thus,
we cannot conclude Dr. Grigson's testimony regarding the sitters' notes was
unexpected. Appellants had sufficient information about Dr. Grigson's opinion and the
content of the sitters' notes to prepare a rebuttal with their own experts and to cross
examine Dr. Grigson. The court did not abuse its discretion in admitting the
complained-of evidence and exhibits. See Allen, 15 S.W.3d at 527-28. Accordingly,
we overrule appellants' first issue.B. Sufficiency of the Evidence to Establish Capacity
         Appellants contend by their second and third issues there is no evidence or
insufficient evidence to support a finding that Robinson lacked testamentary and
mental capacity when she executed the 1995 Will. Appellants assert that the
documentary evidence and the testimony of Robinson's business associates,
attorneys, personal physician, family members, and their expert overwhelmingly
demonstrate that Robinson possessed both testamentary and mental capacity. 
Appellants also contend that even the testimony from the contestants' witnesses
showed Robinson knew the extent and nature of her property and recognized all her
family members.
1. Testamentary Capacity
         In a will contest filed after a will has been admitted to probate, the burden of
proof is on the party contesting the will to establish that the testator lacked
testamentary capacity. Lee v. Lee, 424 S.W.2d 609, 610 n. 1 (Tex. 1968); In re
Estate of Flores, 76 S.W.3d 624, 630 (Tex. App.–Corpus Christi 2002, no pet.);
Graham v. Graham, 69 S.W.3d 598, 605 (Tex. App.–Corpus Christi 2001, no pet.). 
The Texas courts have defined testamentary capacity to mean sufficient mental ability,
at the time the will is executed, to understand the business in which the testatrix is
engaged (the making of the will); the effect of her act in making the will; and the
general nature and extent of her property. Bracewell v. Bracewell, 20 S.W.3d 14, 19
(Tex. App.–Houston [14th Dist.] 2000, pet. denied); see Flores, 76 S.W.3d at 630;
Graham, 69 S.W.3d at 605. The testatrix must also know her next of kin and the
natural objects of her bounty, and have had sufficient memory to collect in her mind
the elements of the business to be transacted, to hold those elements long enough to
perceive their obvious relation to each other, and to form a reasonable judgment about
them. Flores, 76 S.W.3d at 630; Bracewell, 20 S.W.3d at 19; see Graham, 69
S.W.3d at 605.
         The proper inquiry in a will contest on grounds of testamentary incapacity is
whether the testatrix had testamentary capacity on the day the will was executed. 
Graham, 69 S.W.3d at 606 (citing Lee, 424 S.W.2d at 611). However, we "may also
look to the [testatrix's] state of mind at other times if these times tend to show [her]
state of mind on the day the will was executed." Bracewell, 20 S.W.3d at 20 (quoting
Horton v. Horton, 965 S.W.2d 78, 85 (Tex. App.–Fort Worth 1998, no pet.)). We
may consider such evidence "if it demonstrates that a condition affecting the
individual's testamentary capacity was persistent and likely present at the time the will
was executed." Id. (quoting Horton, 965 S.W.2d at 86). 
2. Mental Capacity
         To establish "mental capacity" to contract in Texas the evidence must show
that, at the time of contracting, the person "appreciated the effect of what [she] was
doing and understood the nature and consequences of [her] acts and the business
[she] was transacting." Mandell & Wright v. Thomas, 441 S.W.2d 841, 845 (Tex.
1969); see Bach v. Hudson, 596 S.W.2d 673, 675-76 (Tex. Civ. App.–Corpus Christi
1980, no writ); Board of Regents of the Univ. of Tex. v. Yarbrough, 470 S.W.2d 86,
90 (Tex. Civ. App.–Waco 1971, writ ref'd n.r.e.). Mental capacity, or lack thereof,
may be shown by circumstantial evidence, including: (1) a person's outward conduct,
"manifesting an inward and causing condition;" (2) any pre-existing external
circumstances tending to produce a special mental condition; and (3) the prior or
subsequent existence of a mental condition from which a person's mental capacity (or
incapacity) at the time in question may be inferred. See Bach, 596 S.W.2d at 676. 
As a general rule, the question of whether a person, at the time of contracting, knows
or understands the nature and consequences of her actions is a question of fact for the
jury. See Fox v. Lewis, 344 S.W.2d 731, 739 (Tex. Civ. App.–Austin 1961, writ
ref'd n.r.e.).
3. Standards of Review
a. Legal Sufficiency
         Reviewing a legal sufficiency challenge, we consider only the evidence and
inferences that support the finding. Lenz v. Lenz, 79 S.W.3d 10, 19 (Tex. 2002);
Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 276 (Tex.
App.–Amarillo 1988, writ denied). We disregard all evidence and inferences to the
contrary. Lenz, 79 S.W.3d at 19; Maxus, 766 S.W.2d at 276. Because appellants
are attacking the legal sufficiency of an adverse finding of an issue on which they did
not have the burden of proof, they must demonstrate on appeal that there is no
evidence to support the adverse finding. Croucher v. Croucher, 660 S.W.2d 55, 58
(Tex. 1983); Larson v. Family Violence & Sexual Assault Prevention Ctr. of S. Tex.,
64 S.W.3d 506, 518 (Tex. App–Corpus Christi 2001, pet. denied); Rios v. Tex.
Commerce Bancshares, Inc., 930 S.W.2d 809, 814-15 (Tex. App.–Corpus Christi
1996, writ denied); Gooch v. Am. Sling Co., 902 S.W.2d 181, 183 (Tex. App.–Fort
Worth 1994, no writ).
         The evidence is no more than a scintilla and, in legal effect, is no evidence
"[w]hen the evidence offered to prove a vital fact is so weak as to do no more than
create a mere surmise or suspicion of its existence." Kindred v. Con/Chem., Inc.,
650 S.W.2d 61, 63 (Tex. 1983). Conversely, more than a scintilla exists when the
evidence “rises to a level that would enable reasonable and fair-minded people to differ
in their conclusions.” Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994). We
reverse and render judgment when we sustain a legal-sufficiency point. Vista
Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 177 (Tex. 1986) (per curiam); Heritage
Res., Inc. v. Hill, 104 S.W.3d 612, 619 (Tex. App.–El Paso 2003, no pet.).
b. Factual Sufficiency
          In reviewing a factual sufficiency issue, we examine and consider all of the
evidence, not just the evidence that supports the verdict, to see whether it supports
or undermines the finding. Mar. Overseas Corp., 971 S.W.2d at 406-07. The party
attacking a finding on which an adverse party bore the burden of proof must show that
the record presents “insufficient evidence” to support the finding. Gooch, 902 S.W.2d
at 184. We set aside the finding for factual insufficiency if the “evidence adduced to
support the vital fact, even if it is the only evidence adduced on an issue, is factually
too weak alone to support it.” See Ritchey v. Crawford, 734 S.W.2d 85, 86-87 n.1
(Tex. App.–Houston [1st Dist.] 1987, no writ) (quoting Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 366
(1960)). "Of course, the jury, as trier of fact, is the sole judge of the witnesses'
credibility and of the weight given to their testimony." Bracewell, 20 S.W.3d at 23. 
"Because an appellate court is not a fact finder, we may not substitute our judgment
for that of the jury's, 'even if a different answer could be reached on the evidence.'" 
Id. (quoting Knox v. Taylor, 992 S.W.2d 40, 50 (Tex. App.–Houston [14th Dist.]
1999, no pet.). "In that regard, the amount of evidence necessary to affirm a
judgment is far less than that necessary to reverse a judgment." Id.
4. Analysis
         In addition to the testimony offered by Dr. Grigson, Robinson's medical records
were admitted as exhibits at trial. Additionally, lay witnesses testified to the change
they saw in Robinson and in her ability to conduct business and understand the estate
plan. Lee, 424 S.W.2d at 611 (evidence on issue of testamentary capacity may come
from testimony of lay witnesses).
         Helen Sue Anderson worked as a care giver for Robinson from 1990 until
1998. She also supervised other sitters. Anderson testified Robinson was forgetful
when Anderson first started working at the ranch and that Robinson's physical
condition declined from that time. Anderson saw Robinson become more feeble and
unable to care for herself. Robinson had trouble with her eyesight and hearing. She
did not understand her doctor visits. In 1991 Robinson could no longer drive, and
others took her to various activities. Although Anderson agreed that Robinson did
follow her investments, worried about her taxes, and, on occasion, met with business
persons, including her attorneys, she also testified Robinson was unable to handle her
business and was becoming confused. Anderson also noticed that Robinson's memory
was much worse after the flood in 1994.


 She testified Robinson could not have
understood the estate-planning documents and Robinson complained about this to her.
         Ila May Emerson had been Robinson's friend since the 1950s. She worked for
Robinson as one of her sitters from 1993 to July 1995. Emerson testified Robinson
was forgetful. Her mental condition changed, especially after the 1994 flood. She
was not as alert as she had been earlier. Robinson "got more hopeless" and could not
remember things. Like Anderson, Emerson testified Robinson would have been unable
to read the documents because of the size of the print and would not have understood
the documents she signed in 1995. Emerson also testified, however, that Robinson
played dominoes at her church after July 1995, and that she had discussions with
Robinson about the Bible. Robinson was the "boss of her house."
         Thedford testified Robinson occasionally did not recognize people at church and
had trouble keeping up with her certificates of deposit as a result of bank mergers. 
However, Thedford also testified that up until the stroke in May 1996, Robinson was
a strong woman within her family and knew what she owned and the character of
what she owned. Her testimony additionally set out that Robinson's major reason for
creating the Foundation was to keep the ranch a working ranch after her death.          The Reverend Joe Webb was Robinson's good friend and pastor for twenty-seven years before he retired and moved from the area in 1993.


 Robinson and
Reverend Webb discussed Robinson’s intentions regarding her estate when he first
began his work at the church in the mid-sixties. Reverend Webb discussed it again
with Robinson in 1970 when he asked her if her will was up to date and if it was set
up to achieve her desired purposes. Subsequently, the Foundation was created and
her 1983 Will was executed.
         After his retirement, Reverend Webb visited Robinson on three occasions. His
first visit was in the Spring of 1993 after he returned from a trip to South Africa. 
During this visit, Robinson was not very responsive; there was no real discussion. 
Robinson asked no questions about the trip, although she had shown an interest in the
trip earlier, specifically the mission work being done in East Africa. It appeared as if
Robinson did not realize where the Webbs had been or what they had been doing. 
After fifteen minutes, Reverend Webb and his wife excused themselves, embarrassed
by Robinson’s non-responsiveness. This meeting confirmed a pattern of behavior
Reverend Webb had observed since 1992. He was deeply concerned about
Robinson’s physical health as well as her emotional and mental health. Reverend
Webb had the same experience during two later visits, the first in early 1995 after the
flood and the second in mid-1995. These visits were also short, with little substantive
discussion, just perfunctory responses by Robinson.
         Throughout the years, Robinson indicated to Reverend Webb that her intent was
to leave the bulk of her estate to charitable purposes and that she would take care of
her family in other ways. Testimony regarding his visits in 1993 was evidence of her
diminished functioning. Reverend Webb testified, based on his long relationship with
Robinson, that she could not have understood the documents she signed in 1995 at
issue in this contest and that leaving nothing to charity was absolutely inconsistent
with how she had lived.
         Jack Byrom, president of SMBA and husband of contestant Bobbie Byrom, saw
Robinson within two weeks of her execution of the 1995 Will. He also testified that
on that day "[Robinson] could not have read and understood and executed [the will
and the partnership and trust] documents.” After this early August 1995 visit,
however, he received an unsolicited $5000 contribution from Robinson for SMBA and
acknowledged it with a thank-you letter. Appellants assert that Byrom, by his
acknowledgment, must not have believed he was responding to a person incapable of
understanding her actions. Moreover, Byrom admitted Robinson probably could have
understood that in the 1995 Will she was giving 49% of the ranch to her brother’s
family, 49% to her sister’s family, and a 2% tie-breaking interest to Derace Ayers.
         Moreover, from observations found in the sitters' notes, the jury could have
inferred Robinson lacked capacity when she signed the 1995 Will and other
documents.


 For example, early in 1993, entries in the notes included references to
use of oxygen, dizziness, and not being "as out of it as she was yesterday." In mid-1993, sitters noted the following: "business matters have really begun to confuse
her;" she got nervous and did not know what to do or how to do it; she could hardly
stand, was dizzy, and complained she could not see; "M/R is nervous and upset over
rain and M/Poole;" "[Robinson] is really nervous about all these changes in her life right
now" including losing Mrs. Poole and Brother Webb and Nancy leaving; and "her mind
is getting worse at times." Later in 1993, the sitters noted Robinson's mind was
"getting really bad," "not good," and "bad tonight." On January 11, 1994 the sitter
made the following entry: "she took her bath in the evening & she said she almost
didn't make it back to the chair. She said that she thought the Lord was calling her
home. Then she spent 1st part of night talking with the Lord." Other entries from
January through April 1994 included "shortness of breath," "doesn't have any
strength at all," "seems very out of it today," and "at 10 o'clock said that she sure
was dizzy and that she didn't know why she was so dizzy this morning . . . . was still
very dizzy."  
         There was also testimony that Robinson had capacity at the time in question. 
Randy Stephenson, Robinson's oil and gas attorney, carried on business directly with
Robinson from the 1970s through 1995. Robinson signed oil and gas leases and
discussed them with Stephenson. She would ask questions if she did not understand
the documents and they would discuss her concerns. In August 1994, when Robinson 
signed an option agreement, and in January 1995, when she signed an oil and gas
lease, Stephenson testified he did not question her ability to execute the documents;
"she was perfectly okay to sign."
         John Lawrence Poole managed Robinson's ranch in the mid-nineties. Poole
testified he met with Robinson every seven to ten days and talked with her on what
was happening on the ranch. Poole testified it was not evident Robinson's mind was
bad when he was around her. In 1995 when they discussed business, Robinson gave
good responses and asked appropriate questions.
         Don Sachtleben was Robinson's longtime financial planner from the early 1980s
through her execution of the 1995 Will and estate documents.


 Sachtleben met with
Robinson at his office and at her ranch, even after the flood. He testified Robinson
understood the business they transacted and took an interest in interest rates and tax-free bonds. "Mrs. Robinson knew what she was doing when she was doing business
with me. I explained it to her, and she understood."
         Ruby Van Sant, Anderson’s sister-in-law, began working for Robinson as a sitter
on August 1, 1995, the same month Robinson executed her will, living trust, and
partnership agreements. Van Sant testified that before Robinson's stroke in May
1996, Robinson managed her business to some extent. She wrote checks, went
through her mail with Van Sant, paid her bills, and decided whether she wanted to
make a requested political contribution. Robinson also kept up with her holiday cards
and always answered them or saw that it was done, sent thank-you notes for gifts
received, enjoyed social visits, talked about the cattle business, enjoyed driving around
the ranch and going into town, kept up with ranch happenings, was interested in the
oil and gas business, had a good sense of humor, was exuberant for her age, and was
"queen of her domain." Van Sant testified she could not recall any time before the
May 1996 stroke when Robinson was not in command of her senses. Robinson was
a strong, capable person with physical ailments. She remained alert until her death. 
At times, Robinson would be upset, but she never seemed confused or disoriented. 
Until her 1996 stroke, Van Sant testified, Robinson was probably capable of making
decisions for herself but could have been influenced.
         Reverend Jim Gilbert became Robinson's pastor at the end of 1993. He was
amazed when Robinson, who was in her 90s, recited a very long poem from memory
at a meeting in January 1994. He also testified, in his opinion, it was possible she
could have understood the division of her property under the estate plan and that she
was capable of understanding the significance of the gifts she had given to the church. 
Reverend Gilbert also testified that in the following months and years he could tell
“there was a [physical] decline going on in her,” and within two years of the meeting
“it began to dawn on [him] that [Robinson] was not as present mentally as [she had
been].”
         David W. Samuelson, M.D., Robinson's internist and personal physician,
testified he adjusted her medications and began seeing Robinson regularly beginning
in March 1993. Dr. Samuelson observed no indication that Robinson had a mental
problem. She appeared alert and oriented. He did not observe that she was suffering
from a gross impairment of her memory, reasoning, or judgment. Dr. Samuelson also
testified that one could not determine whether Robinson had gross impairment from
a CT scan. Dr. Samuelson testified that he treated Robinson when she had the stroke
in 1996. Initially she was confused but went into rehabilitation for two or three weeks
and appeared to be intact mentally. There was some initial change, but it was not
permanent.
         Appellants' expert, Richard Bernard Pesikoff, M.D., a psychiatrist and professor
at Baylor College of Medicine, opined that Robinson’s condition would in no way
prevent her from understanding and meeting the requirements that are part of signing
a will. He noted the medical records indicated a history of arteriosclerosis


 and long-standing problems with hypertension which can also relate to insufficient oxygen, but
they did not support a conclusion of gross impairment of Robinson’s mental faculties. 
He testified that Robinson probably did have the capacity to write a will. 
         Furthermore, Dr. Pesikoff found no support in any documents he reviewed
including, among other materials, sitters’ notes and depositions, that Robinson lacked
capacity. He pointed out how these documents showed Robinson was functioning at
a normal level. According to Dr. Pesikoff, Robinson’s medical records lacked any
evidence that her condition was related to a heart condition or lack of oxygen to the
brain. Rather, it was his opinion that Robinson had lung problems, including asthma,
some chest congestion, and trouble breathing. While Dr. Pesikoff agreed that lack of
blood flow to the brain could create a problem, in his opinion it did not do so in this
case. Before her stroke, according to Dr. Pesikoff, Robinson’s blood was bringing
sufficient oxygen to her brain. Dr. Pesikoff testified Robinson's medical records also
lacked any evidence that her brain was oxygen-deprived. It was his opinion that
Robinson’s high blood pressure caused her dizziness, not a lack of oxygen to her brain. 
In his opinion, the high blood pressure also caused Robinson's confusion, tiredness,
and ultimately a stroke.
         Family members, including Robinson's sister and nieces and nephews, testified
that Robinson was a strong, independent woman whose mind was sharp; that before
the stroke she acted normal. She was interested in ranch business and activities. A
nephew testified he noted nothing wrong with his aunt after the flood. Another
nephew testified his aunt's mind was not as sharp, but it was good after the stroke. 
Witnesses testified that Robinson knew her family members and asked about those
who were absent from a family gathering or a church function; talked appropriately
about things, past and present; and understood the significance of documents she
signed. Many testified that, for years, Robinson expressed her desire to leave the
ranch to her family but felt she could not do so because of taxes. They also testified
that Robinson expressed her desire that the ranch continue operating as a working
ranch after her death.
         There was also testimony and documentary evidence that Robinson worked with
her attorneys from December 1994 through May 1996 in formulating and
implementing an estate plan. The evidence reveals that Robinson met with her
attorneys either alone or with the Ayers. She discussed her concerns with them,
particularly her desires to get her family more involved as executors and to leave the
ranch to family but not to pay a lot of taxes. However, the record also reveals that
there were communications between only Robinson's attorney and her relatives
regarding her estate plan. The jury could have inferred that Robinson's counsel and
relatives, by not including her in the conversations, did not believe that she understood
the making of the will and the effect of her act, Bracewell, 20 S.W.3d at 19, or that
she "appreciated the effect of what [she] was doing and understood the nature and
consequences of [her] acts and the business [she] was transacting." Mandell &
Wright, 441 S.W.2d at 845.
         Finally, while the contestants relied on a number of excerpts of notes taken by
Robinson's sitters in 1993 and 1994, appellants relied on other excerpts, including
those setting out the following: Robinson was doing her "book work" followed by a
full day of activities; she met with business associates and managed her finances; and
she visited with friends, went to church, and donated money to favorite causes. 
Appellants contend the sitters' notes, taken as a whole, reveal a woman–elderly and
with physical infirmities–living a full life.
         Based on our review of the record, considering only the evidence and inferences
that support the finding and disregarding all evidence and inferences to the contrary,
we conclude that Dr. Grigson's testimony constitutes legally sufficient evidence of
incapacity. See Lenz, 79 S.W.3d at 19; Croucher, 660 S.W.2d at 58; Maxus, 766
S.W.2d at 276. Dr. Grigson testified Robinson lacked testamentary capacity when she
signed the 1995 Will and mental capacity when she executed partnership agreements
on August 14, 1995. Dr. Grigson provided testimony regarding physical problems,
i.e., atherosclerotic heart disease or hardening of the arteries, that he concluded was
consistent with mental incapacity. See Croucher, 660 S.W.2d at 57. Moreover, in
addition to Dr. Grigson's testimony, there is evidence from which the jury could have
inferred that Robinson's problems, shown to have existed as early as 1991, kept her
from having testamentary capacity to execute a will in August 1995 and the mental
capacity to sign related documents. Thus, we conclude there is some evidence to
support the adverse finding of lack of testamentary and mental capacity. See
Croucher, 660 S.W.2d at 58.
         Furthermore, after reviewing all of the evidence, we conclude the evidence is
factually sufficient to support the finding of incapacity. See Mar. Overseas Corp., 971
S.W.2d at 406-07; Gooch, 902 S.W.2d at 184; Ritchey, 734 S.W.2d at 86-87 n.1;
see also Bracewell, 20 S.W.3d at 23 (because amount of evidence necessary to affirm
judgment is far less than necessary to reverse judgment, and because we are not fact
finder, we may not substitute our judgment for jury's, even if different answer could
be reached on evidence).
         Accordingly, appellants' second and third issues are overruled.
IV. The FoundationAppellants contend in their fourth issue that the trial court erred by allowing the
Foundation to prosecute claims because it had been dissolved and did not have
standing as a contestant. By their fifth issue, appellants also claim the trial court
compounded this alleged error by excluding evidence regarding the revival of the
Foundation.
         The Foundation was dissolved on December 20, 1996. It joined the lawsuit as
a plaintiff on October 26, 2000 challenging, in part, the validity of the documents
Robinson signed to allegedly effectuate the Foundation's dissolution. Specifically, the
Foundation alleged "Robinson did not have sufficient mental capacity under Texas law
to execute the Dissolve Resolution on November 15, 1996, and, therefore, it is invalid
. . . ." The Foundation's claims, however, were brought within two years of the
probate of the 1995 Will, see Tex. Prob. Code Ann. § 93 (Vernon 2003) (statute of
limitations for filing will contest is two years to contest the validity of will after
admission to probate or after discovery of forgery or fraud), and within four years of
the date the dissolution documents were filed and certificate of dissolution was issued. 
See Tex. Civ. Prac. & Rem. Code Ann.§ 16.051 (Vernon 1997) ("every action for
which there is no express limitations period, except an action for the recovery of real
property, must be brought not later than four years after the day the cause of action
accrues").
         Appellants are not arguing a limitations bar as to the Foundation. Rather, they
are contending the Foundation lacked standing because its claim was brought almost
four years after the Foundation was dissolved. This argument is premised upon article
7.12 of the Texas Non-Profit Corporation Act, a survival statute which provides that
claims by or against a charitable corporation must be brought within three years after
its dissolution. Tex. Rev. Civ. Ann. art. 1396-7.12 (Vernon 2003). To reach this
argument, however, the Foundation must have been dissolved.  
         In this case, the court found Robinson lacked mental capacity to execute
documents related to the dissolution of the Foundation. The trial court declared the
articles invalid and ordered them set aside. The court further declared that the
certificate of dissolution for the Foundation was invalid because it was based on invalid
articles of dissolution. The court ordered the certificate of dissolution set aside. 
Finally, the court ordered the office of the secretary of state to reinstate the
Foundation as a valid Texas non-profit corporation in good standing.
         We have concluded that the evidence supports the finding that Robinson lacked
mental capacity to sign the documents at issue in this contest. Thus, the judgment
correctly declared that the articles were invalid and set them aside. Appellants'
argument fails because the Foundation was never dissolved, and section 7.12 of the
Texas Non-Profit Corporation Act does not apply. We overrule issues four and five.V. Undue Influence
         By their sixth issue, appellants complain that the evidence is legally and factually
insufficient to support the jury's findings of undue influence. By their seventh and
eighth issues, appellants also complain of insufficient evidence and charge error
regarding appellees' claim that the family's attorneys acted as agents for the family
or acted on their behalf to influence Robinson. However, because undue influence
assumes the existence of testamentary capacity, see Lowery v. Saunders, 666 S.W.2d
226, 233 (Tex. App.–San Antonio 1984, writ ref'd n.r.e.), and because we have
upheld the trial court's finding that Robinson did not have testamentary capacity, we
need not address issues six, seven, and eight. See Tex. R. App. P. 47.1 (court of
appeals to address every issue raised and necessary to final disposition of appeal).VI. Limitations as to Thedford, Byrom, and Guffey
         By their tenth issue, appellants contend the trial court erred in failing to dismiss
the claims filed by Thedford, Byrom, and Guffey. Appellants assert that because
Thedford, Byrom, and Guffey contested the lawsuit more than two years after the will
was probated, their claims are barred.
         Section 93 of the Texas Probate Code provides that within two years after a will
is admitted to probate any interested person may institute suit to contest its validity,
except that any interested person may institute suit to cancel the will for forgery or
other fraud within two years after the discovery of such forgery or fraud. See Tex.
Prob. Code Ann. § 93 (Vernon 2003). However, 
[i]t is firmly established in [Texas] that the timely institution of a suit to
contest a will that [has] been admitted to probate, by a person who
comes within the statutory definition of "interested persons," precludes
the defense of limitations against other interested persons and
contestants who would otherwise be barred.

Turcotte v. Trevino, 499 S.W.2d 705, 719 (Tex. Civ. App.–Corpus Christi 1973, writ
ref'd n.r.e.); see Tex. Prob. Code Ann. 3(r) (Vernon 2003) ("interested persons" mean
"heirs, devisees, spouses, creditors, or any others having a property right in, or claim
against, the estate being administered; and anyone interested in the welfare of a minor
or incompetent ward"); see also Tex. Prob. Code Ann. § 10 (Vernon 2003) (any person
interested in an estate may, at any time before any issue in any proceeding is decided
on by court, file opposition thereto in writing and is thereupon entitled to process for
witnesses and evidence, and to be heard on such opposition, as in other suits).



         The 1995 Will was probated on December 8, 1998. SMBA and STCH timely
filed the will contest on February 24, 2000.


 The filing of the lawsuit tolled the
running of the statute of limitations with respect to the rights of Thedford, Byrom, and
Guffey to intervene as plaintiffs on January 5, 2001, more than two years after the
contested will was probated, even though they would be barred by the two-year
statute of limitation if they had instituted their suit in a separate action. See id. 
Appellants' tenth issue is overruled.
VII. CONCLUSION
         Accordingly, we affirm the judgment of the trial court.                               
                                                                        NELDA V. RODRIGUEZ
                                                                        Justice

Opinion delivered and filed
this 24th day of June, 2004.