**Affirmed and Memorandum Opinion filed October 25, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00910-CV

---

### CAROLINE LE, Appellant

### V.

### TRAM T. NGUYEN, Appellee

---

**On Appeal from the Probate Court No. 2
Harris County, Texas
Trial Court Cause No. 393,562**

---

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final judgment in a will contest. Appellant, Caroline Le, applied to probate a will the decedent, Alex Khoi Nguyen, signed on December 31, 2009. Appellee, Tram T. Nguyen, Alex's niece, filed a will contest alleging that her uncle did not have testamentary capacity at the time he signed the December 31, 2009 will. The issue was submitted to a jury and it determined Alex did not have testamentary capacity on December 31, 2009. The trial court entered judgment in accordance with the jury's finding and appellant appealed. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2009, Alex was a 57year old professional photographer. In September of that year, Alex was diagnosed with gastric cancer and he began to go in and out of the hospital for treatment. On December 1, 2009, Alex signed a will and other documents (the "December 1 Will"). Alex's condition began to deteriorate rapidly and he was transferred from hospice care to the hospital on December 27, 2009. During his hospitalization Alex's condition progressively declined, and after consultation with his family, Alex's status was "made DNR/DNI and comfort care." Once he entered the hospital on December 27, Alex was given intravenous opioids to control his pain.

During his final hospitalization, Alex asked his sister to procure a lawyer to write a new will for him. Alex's sister retained Tom Hoang, an attorney licensed to practice law in the state of Texas. Hoang came to the hospital on December 29, 2009, to meet with Alex. During that meeting, Hoang took notes regarding how Alex wished to construct his will. Following that meeting, Hoang returned to his office and drafted a proposed will. Hoang then returned to the hospital twice, on December 30 and again on December 31, to obtain Alex's signature on the proposed will. Hoang was unsuccessful at obtaining the signature because Alex was unable to sign during both visits. When Hoang had to leave the hospital on December 31, he left the will with appellant, Alex's fiancée.

Among the people visiting Alex on December 31 were appellant and an employee of Alex's photography studio, Sampson Thomas.[1] Two friends were also present: Linh Nguyen and Tuyet Do. After Hoang left the hospital, Alex signed the will prepared by Hoang (the "December 31 Will"). Linh Nguyen and Tuyet Do signed as witnesses. The document was not notarized because there was no notary public available at the hospital on New Year's Eve. Alex died on January 3, 2010.

On January 7, 2010, appellee filed an application to probate the December 1 Will.

---

[1] Thomas's name is also spelled Samson Thomas in the appellate record.

The December 1 Will was admitted to probate on January 24, 2010, and appellee was appointed the independent executor of Alex's estate. Appellant filed her application to probate the December 31 Will on February 4, 2010. The probate court set aside the order admitting the December 1 Will to probate. Appellee filed a will contest on September 28, 2010. Eventually, the will contest went to trial before a jury.

During the ensuing trial, five witnesses testified. Because appellant challenges the sufficiency of the evidence supporting the jury's verdict, we recount the testimony of each witness.

**Caroline Le**

Appellant was the first witness to testify. According to appellant, she started dating Alex in March of 2009 and they became engaged prior to his final hospitalization. Appellant explained that Alex became sick in August of 2009, and he was finally diagnosed with stomach cancer in September of 2009. Alex was then in and out of the hospital until he entered the hospital for the final time on December 27, 2009.

Appellant was visiting Alex in the hospital on December 28, 2009, when he mentioned that he wanted to change his will. Alex told appellant that "he wanted to make a will for [her]." Appellant testified that Alex did "not agree with his ex-wife and the people taking care of his children." Appellant further testified that Alex wanted to thank her for taking care of him by giving her some of his property when he passed away. One of Alex's sisters called a lawyer that day, and he visited Alex in the hospital on December 29, 2009.

Appellant also visited Alex in the hospital on December 29, 2009. During that visit, Alex talked about Yen Link, his photography studio, and his desire that appellant take care of the business if he was not there. Later that day, an attorney named Tom Hoang called her and told her that he was drafting a will for Alex and that Alex was giving her some of his property. Appellant also visited Alex on December 30, 2009, but there was no conversation about a will.

3

Appellant arrived at the hospital early on the morning of December 31, 2009, and she stayed with Alex the entire day. Alex was on oxygen support that day, which meant that a small tube was inserted into his nose. According to appellant, Alex recognized her when she arrived and he understood her when she spoke. On December 31, while Alex spoke occasionally, he spoke very softly and not very clearly. Appellant testified that Alex primarily communicated by moving his head to agree or disagree. Appellant testified that Alex was receiving medication, but she did not know the type. Appellant also testified that nurses would come in about every hour and when they did, visitors had to leave the room.

Appellant testified that Alex fell asleep about 9:00 a.m. and he slept until lunchtime. The lawyer, Tom Hoang, arrived with the will he had drafted for Alex and he started reading the will to him. However, while Hoang was reading the will, a doctor came into the room and asked everyone to step out. At that point, Hoang stated he had to leave but left the will with appellant. According to appellant, Hoang asked her to call him when Alex woke up.

Two friends visited Alex that afternoon: Tuyet Do and Linh Nguyen. A fourth person was also present in the room that afternoon: Sampson Thomas, Alex's photography technician. All four were present when Alex woke up during the afternoon. Appellant testified she called Hoang to inform him that Alex was awake, but Hoang told her he could not return to the hospital that day. Appellant also testified Hoang told her that if two witnesses were available, Alex could still sign the will.

At that point, Tuyet Do asked Alex if he wanted to sign the will, and "Alex, he nod his head." Appellant then testified that Linh read the entire will to Alex and when he finished, asked him if he wanted to sign the will and Alex nodded his head. According to appellant, Alex signed each page of the will and then Tuyet Do and Linh signed as witnesses. Appellant explained there was no notary available in the hospital because it was New Year's Eve. Appellant testified Alex signed the will during the afternoon of December 31, 2009.

4

Appellant testified that no one held Alex's hand or signed the will for him. She also testified that Alex did not appear confused during the process. Finally, appellant testified that after Alex signed the will, she kept it in her possession.

On cross-examination, appellant testified that even though the will states that Alex was in good health, he was a sick man when he signed the December 31 Will. Also on cross-examination, appellant testified that Alex knew he was married on December 31, 2009, even though the will states that he was not married. Finally, appellant testified that appellee is Alex's niece, the daughter of his sister, Van Bich Nguyen, who had died in 1993.[2] Appellant agreed that in the December 31 Will (1) Alex designated Van Bich Nguyen as a substitute executor of Alex's estate; (2) after making some specific bequests, Alex bequeathed the remainder of his estate to two of his sisters: "Loan Bich Nguyen and Van Bich Nguyen so they can save it for my children"; and (3) Alex designated Van Bich Nguyen as the substitute guardian of his two children.

**Linh Nguyen**

Linh Nguyen was the second witness to testify. Linh testified that he was a friend of Alex's and was not related to him. According to Linh, he arrived at the hospital around 4:30 or 5:00 p.m. on December 31, 2009. Alex was not awake when Linh arrived, but Alex eventually woke up. Linh testified they talked for a short while.

Linh eventually learned that a lawyer had been there earlier in the day with a will for Alex to sign but he was not able to sign it at that time. Linh then read every word of the will in Vietnamese and explained what he thought it meant to Alex. Once Linh had read the entire will to Alex, he asked if this was the will for him to sign and Alex "just nod, yes." Linh then asked Alex if he was ready to sign and Alex said "yes." During his testimony Linh was also asked about each section of the will and how he explained it to Alex and how Alex responded to that explanation. In each instance, Linh testified that Alex nodded. Linh then testified that Alex, unassisted by anyone, signed every page of

_____

[2] A certified copy of Van Bich Nguyen's Death Certificate was admitted into evidence.

the December 31 Will.  Linh and Tuyet Do then signed as witnesses.

On cross-examination, Linh was asked about Alex's condition on December 28, 2009.  According to Linh, Alex was sitting up, able to talk, and capable of making decisions that day.  Linh also explained that Alex's condition worsened between December 28 and December 31, 2009.  Linh described Alex as looking more tired and weaker, and he said Alex was not able to speak on December 31, 2009.

Linh was also asked "[s]o you didn't read it verbatim if you summarized it?"  Linh answered: "right."  Linh then testified that Alex tried to make sounds that day.  Linh denied the sounds were incomprehensible, testifying that he understood what Alex was trying to communicate: "As I asked him, Is this the will – is this what you want for the children?  Yes.  He makes those sounds or movements; and I understood that's what he understands, what I'm asking him."  Linh was then asked about the meaning of nods in Vietnamese culture.  In response, Linh testified that a nod can have two meanings: (1) an acknowledgement that a person is talking to you; and (2) an acknowledgement that you understand and agree with what the speaker is saying.  Linh also testified on cross-examination that Alex could have had his eyes closed during parts of the will signing.

Linh testified during cross-examination that appellant handed him the unsigned will after he arrived at the hospital.  Finally, Linh testified that Alex did not ask Linh or Tuyet Do to act as witnesses, they volunteered.

**Tuyet Do**

Tuyet Do was the second person who signed the December 31 Will as a witness.  Do testified that she was a friend of Alex's and she arrived at the hospital to visit him before noon on December 31, 2009.  She further testified that she stayed for five or six hours.  Do explained she became a witness because she was present in the hospital visiting Alex.  Do testified that she observed Alex sign each page of the December 31 Will.  Do also testified that she left soon after Alex signed the December 31 Will.

On cross-examination, Do testified that while she was visiting Alex in the hospital

6

on December 31, Alex would sleep, wake up, and then fall asleep again. According to Do, she was present in the hospital when Hoang arrived with the will. Do testified that Alex did not sign the will while Hoang was present in the hospital room because he was asleep.

Do testified that Alex could not talk on December 31, 2009, but he could understand her when she spoke and he indicated this by moving his head. Do also testified she "told him, if anything, you agree, just move your hand." Do explained that she saw Alex move his hand but did not remember where his hand was when he moved it. Instead, she testified "I just remember he moved his hand. Because I put my hand in his hand and I feel it." Do testified that she did not remember if Alex had his eyes open or closed while Linh read the will to him. Finally, Do testified that she knew Alex left appellant his photography studio because he had told her he was going to do so many days before he passed away.

On re-direct examination, Do testified that, while she did not remember if Alex was asleep when he signed the will, she did see him sign it with his own hand.

**Tom Hoang**

Hoang was the next witness to testify. Hoang identified himself as the attorney who drafted the December 31 Will. Hoang began by testifying about his meeting with Alex on December 29, 2009. According to Hoang, he met personally with Alex in his hospital room to find out what Alex wanted in his will. Hoang explained that Alex could not speak like they were speaking in court, instead Alex was somewhat sedated, very weak, and spoke in very soft tones. When asked if, during his meeting with Alex about the contents of the will, Alex gave him any "cause to believe that he did not know what he was talking about?" Hoang responded: "I don't think so. But everyone around him gave me cause to believe that he was not his normal self." Hoang also testified: "And that's what I was trying to tell you …, if you asked my [sic] if he knew what he was doing, I don't know because –" Hoang explained that Alex was drifting in and out during their meeting on December 29. In addition, they were occasionally interrupted by nurses

7

coming into the room to sedate Alex. Hoang testified that his normal will preparation form was not completely filled out because he gave up on completing Alex's form when the nurses had "to sedate him again because [Alex] was in so much pain." When asked if Alex responded to him, Hoang answered: "He understood me. He responded but physically it was hard for him to respond but I thought he understood me." Hoang explained that during their meeting on December 29, 2009, he believed Alex understood what he intended to do in his will, "otherwise [he] wouldn't have drafted the will." Hoang, when asked if any person other than Alex gave him information to be included in the will, answered: "No, I don't think so."

Hoang also testified about Alex's marital status. According to Hoang, despite the December 31 Will stating that he was not married, Alex was married at the time of his death. According to Hoang, he represented Alex's current wife in her effort to obtain a divorce from Alex but it was not completed prior to Alex's death.[3]

Hoang then turned to the events of December 31, 2009. After interviewing Alex, Hoang prepared the December 31 Will and he brought it to the hospital on December 30, 2009, for Alex to sign. Although Hoang waited for a substantial length of time, Alex was too sedated to sign the will.

Hoang returned to the hospital in the late afternoon of December 31, 2009, in a second attempt to get Alex's signature on the December 31 Will. Hoang testified that Alex had just been sedated when he arrived. According to Hoang, Alex was being sedated because "[h]e was in pain, a lot of pain." Despite the fact that Alex had just been sedated, Hoang remained in Alex's hospital room for two or three hours that day. Hoang testified that he was unable to get Alex's signature because Alex could not understand since he was so sedated. Hoang testified that Alex "was in and out" while he was there. Hoang testified that Alex was not aware of his surroundings and could not understand Hoang when he tried to explain the contents of the December 31 Will to him. Hoang also

---

[3] Hoang explained that, due to the hurried nature of the request to draft a will for Alex, he did not realize at the time that he was representing Alex's current wife in a divorce proceeding.

testified that Alex kept falling asleep and was unable to hold a pen. Hoang stated that, in his opinion, Alex lacked testamentary capacity while he was there on December 31, 2009. According to Hoang, Alex was sedated and "he didn't know what he was doing," so he could not sign the December 31 Will. At that point, about 5:00 p.m., Hoang had to leave because he had a New Year's function to attend, but he left the will with appellant who was visiting Alex. According to Hoang, Alex was not awake when he left the hospital.

**Tram Nguyen**

Appellee, Alex's niece, was the final witness to testify. Appellee testified about several subjects. First, she explained that her mother, Van Bich Nguyen, was Alex's sister, who died in 1993. Second, appellee testified that nothing in the December 1 Will left anything to or imposed any responsibilities on Alex's ex-wife, Kathy Tieu. Finally, appellee testified that she visited Alex on December 30, 2009. During her visit, Alex did not recognize her and he appeared to be in a lot of pain.

At the close of the evidence the case was submitted to the jury and it found that Alex did not have testamentary capacity when he executed the December 31 Will. The trial court entered judgment in accordance with the jury's finding. Appellant filed a motion for new trial, which the trial court denied with a written order. This appeal followed.

## DISCUSSION

In this appeal, appellant raises six issues, which we consolidate into three.

## I. Sufficiency of the evidence

In her first issue appellant contends the evidence is legally and factually insufficient to support the jury's negative answer to Question 1 of the Jury Charge; a question on which she had the burden of proof. *See Seigler v. Seigler*, 391 S.W.2d 403, 404 (Tex. 1965). Question 1 of the trial court's charge asked: "Did Alex Khoi Nguyen have testamentary capacity when he executed the will dated December 31, 2009?" The

question provided the following instruction:

> You are instructed that in order to have testamentary capacity at the time of the signing of the will, Alex Khoi Nguyen must have had all of the following:
>
> 1. Have had sufficient mental ability to understand the business in which he was engaged, the effect of his act in making the will, and the general nature and extent of his property;
>
> 2. Be able to know his family and the natural objects of his bounty and their claims upon him; and
>
> 3. Have enough memory to understand the elements of the business about to be transacted, to remember those elements long enough to perceive their obvious relation to each other and to be able to form a reasonable judgment as to them.

The jury answered Question 1: "No."

## A.    The standard of review and applicable law

When both legal and factual sufficiency challenges are raised on appeal, we must first examine the legal sufficiency of the evidence. *City of Houston v. Cotton*, 171 S.W.3d 541, 546 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). To prevail on a legal sufficiency challenge to a question on which it had the burden of proof, a party must establish that (1) there was no evidence to support the jury's finding, and (2) the evidence established a contrary proposition as a matter of law. *Lundy v. Masson*, 260 S.W.3d 482, 491 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). In a legal sufficiency review, we must view the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports the verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 807, 827. If the evidence falls within the zone of reasonable disagreement, we cannot substitute our judgment for that of the fact finder. *Id.* at 822. The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.* at 819. Unless there is no favorable evidence, or if the contrary evidence renders supporting evidence incompetent, or conclusively establishes the opposite, we must affirm. *See id.*

10

at 810–11. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair minded people to reach the verdict under review." *Id.* at 827.

In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party attacks the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We are not a factfinder. *Ellis*, 971 S.W.2d at 407. Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Id.* If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Gonzalez v. McAllen Med. Ctr., Inc.,* 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

A testator has testamentary capacity when he has sufficient mental ability to understand that he is making a will, and the general nature and extent of his property. *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2000, no pet.). He also must know the natural objects of his bounty, the claims upon them, and have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *Id.* In a will contest, the pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968). However, evidence of the testator's state of mind at other times can be used to prove his state of mind on the day

11

the will was executed provided the evidence demonstrates a condition affecting his testamentary capacity was persistent and likely present at the time the will was executed. *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983). "Incapacity to make a will … is a subtle thing, and must be established to a great extent, at least so far as lay witnesses are concerned, by circumstantial evidence." *In re Boultinghouse's Estate*, 267 S.W.2d 614, 619 (Tex. Civ. App.—El Paso 1954, writ dism'd).

## B.     Analysis

In this case the jury heard conflicting evidence relating to whether Alex had testamentary capacity when he signed the December 31 Will. Appellant testified that Alex recognized her on December 31, 2009, could speak occasionally, and otherwise communicated by moving his head to agree or disagree. Appellant also testified that Alex was awake when Linh read the December 31 Will to him, did not appear confused, recognized mistakes in the will by nodding his head, and nodded his head indicating that he wanted to sign the will, which he then did unaided by anyone. Linh testified that he read Alex the entire will and explained it to him. In addition, when Linh asked if that was the will he wanted to sign, Alex nodded his head "yes." Do also testified that while Alex could not talk, he could communicate by moving his head or hand and that was how he communicated that he wished to sign the December 31 Will.

In opposition to the above testimony, the jury also heard evidence indicating Alex did not have testamentary capacity on December 31, 2009. This evidence included the fact that Alex was in the final stages of gastric cancer, suffering great amounts of pain as a result, and was receiving medication to relieve that pain including regular sedation. Appellant and Linh both testified that Alex's condition worsened dramatically between December 28 and December 31, 2009. Several witnesses testified that Alex could not talk on December 31 and communicated his wishes by nodding his head. However, Linh testified that in Vietnamese culture, nodding one's head can signify agreement with the speaker or merely recognition that the speaker was talking. The jury also heard Hoang's testimony that he did not believe Alex possessed testamentary capacity at the time Hoang

12

finally left the hospital about 5:00 p.m. on December 31, 2009. The jury also heard evidence that Do arrived at the hospital before noon that day and remained for five or six hours, departing soon after Alex signed the will. In addition, the jury heard Linh's testimony that he arrived at the hospital around 4:30 or 5:00 p.m. that afternoon, after Hoang had departed, and the December 31 Will issue was addressed after his arrival but before Do departed. Based on this evidence the jury could have reasonably concluded that Alex's condition at the time Hoang departed was persistent and still present when he signed the December 31 Will.

In addition, the jury could consider the fact that appellant was a named beneficiary under the December 31 Will and therefore an interested witness at trial. Because they can observe a witness's demeanor, juries are given great latitude as fact finders to believe or disbelieve a witness's testimony, particularly when the witness is interested in the outcome. *See In re Doe 4*, 19 S.W.3d 322, 325 (Tex. 2000) (addressing a trial court as a fact finder). In addition, the jury can reject the uncontroverted testimony of an interested trial witness unless the testimony is readily controvertible, clear, positive, and direct, and there are not circumstances that tend to discredit or impeach the testimony. *Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989). Here there was controverting evidence from Hoang as well as circumstances tending to discredit appellant's testimony. Though they were not interested trial witnesses, the same can be said about Do and Linh's testimony. Therefore, the jury could reasonably have chosen to disbelieve all three eyewitnesses' testimony regarding Alex's mental capacity at the time he signed the December 31 Will.

The jury could also have considered Alex's failure to recognize factual mistakes in the December 31 Will, including his incorrect marital status and the fact that his dead sister had been named a substitute guardian of Alex's minor children, as evidence that Alex did not have testamentary capacity when he signed the December 31 Will. *See Gayle v. Dixon*, 583 S.W.2d 648, 651 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (quoting *Michon v. Avalla*, 19 S.W. 878, 880 (Tex. 1892) ("Acts occurring

before or after or at the time of the execution of the instrument tending to throw light upon the mental condition of the party, are admissible.")).

Because there is more than a scintilla of evidence supporting the jury's finding that Alex did not have testamentary capacity on December 31, 2009, the evidence is legally sufficient. In addition, the evidence is factually sufficient as the finding is not so contrary to the overwhelming weight of evidence as to be clearly wrong and unjust. *See Sebesta v. Stavinoha*, 590 S.W.2d 714, 718 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (holding that even though the evidence was disputed, it was sufficient to support the jury's finding that the testatrix did not have testamentary capacity on the date the will was executed). We overrule appellant's first issue.

## II.      Incurable jury argument

In her second issue, appellant contends the trial court's judgment should be reversed because appellee's trial counsel engaged in allegedly incurable jury argument. Appellant specifically briefs only two episodes of allegedly incurable jury argument. First, appellant complains about references by appellee's attorney during closing argument to a note handwritten in Vietnamese by Alex on December 28, 2009. The note was admitted into evidence during the trial.[4] According to appellant, appellee argued the December 28 note "was a testamentary instrument and that the deviation from it by the will of December 31, 2009, was a mistake of fact or evidenced some bad motive by

---

[4] A translation of the December 28, 2009 note was attached to it and was admitted into evidence as part of the same exhibit. The translation of the note reads:

> My name is Ngoc Khoi Nguyen I'm disagree the will of Yen Link Mother of my two children name Tieu, Ngoc Kieu If I'm pass away. All my money will go to my two children Josuhua [sic] and Roxanne So two of them continue for photo shop job with the support from Bich Ngoc wife or Dr. Vu Ban with support of Caroline Joanne and Samson Thomas photo technician.
>
> All the above my idea is all true
>
> His signature 28/22/2009

The note was also signed by Linh Nguyen, a "Simson Thomas," and a Mrs. Nguyen Ngoc.

The note and translation were admitted into evidence without objection by appellant once it was agreed on the record that "Joanne" should actually read "fiance."

14

someone" and that this argument constitutes incurable jury argument.[5] Second, appellant contends appellee's discussion during closing argument of the fact that the December 31 Will named a deceased person, Van Bich Nguyen, a substitute guardian also constitutes incurable jury argument.[6] Appellant did not object to either argument.

Complaints of improper jury argument must ordinarily be preserved by a timely objection that is overruled, or if the objection is sustained, then by a request that the jury disregard the improper remark. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009); *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). Failure to timely object waives any complaint that the closing argument was improper and curable. *Tex. Employers' Ins. Ass'n v. Haywood*, 266 S.W.2d 856, 858 (Tex. 1954). In limited situations, however, an argument may be so prejudicial that it is incurable by instruction, and a complaint may be had on appeal even if an objection was not timely made. *See* Tex. R. Civ. P. 324(b)(5); *Clark v. Bres*, 217 S.W.3d 501, 509 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Incurable jury argument is rare. *Clark*, 217 S.W.3d at 509. It exists only when the argument is so prejudicial or inflammatory that an instruction to disregard cannot

---

[5] The argument at issue here consists of the following: "The result of the will: The result was pretty different than what was on the 28th, pretty different from what he wanted to what was done to what was even translated."

[6] The second allegedly incurable argument runs:

But what's amazing here is this. Everyone has testified that Alex was sleepy. He was on pain medication. He was in pain and even the lawyer testified that he didn't have capacity to sign a will the day before. He didn't have capacity to sign the will the day he signed the will when he was there. Tram Nguyen testified that he didn't even recognize her. And then they're going to rely on the fact – I love this – that he left the instructions specifically to the lawyer and he named somebody that was dead for 16 years. Talk about not knowing who your family is. You mean the wife of the person that rescued you from Vietnam, you don't remember their name and you don't remember the fact that they're dead for 16 years and that's the person you appoint to be the guardian of your children.

If there's any name that you want to get correct, you want to get correct the name of the person that you're going to appoint the guardian of your children, pure and simple. He appointed Van Bich Nguyen as guardian of his children even though she had been dead for 16 years.

15

eliminate the harm. *Id.* To establish that a jury argument is incurable, the complaining party must prove: (1) an improper argument was made; (2) that was not invited or provoked; (3) that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court; and (4) that by its nature, degree, and extent, constituted reversibly harmful error based on an examination of the entire record to determine the argument's probable effect on a material finding. *Id.* Stated another way, the offensive argument must be so extreme that a juror of ordinary intelligence could have agreed to a verdict contrary to what he would have decided but for such argument. *Zurita v. Lombana*, 322 S.W.3d 463, 482 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

A litigant is entitled to have his counsel argue the facts of the case to the jury. *Clark*, 217 S.W.3d at 510. Trial counsel may properly discuss the reasonableness of the evidence as well as the probative effect or lack thereof, of the evidence. *Id.* In addition, attorneys may argue reasonable deductions and inferences from the evidence properly before the jury. *Id.* Trial counsel should be allowed wide latitude in arguing the evidence and the reasonable inferences from the evidence to the jury. *Id.* Because the challenged arguments addressed matters in evidence, we conclude these arguments were not improper. *Id.* We overrule appellant's second issue on appeal.

## III.     Motion for New Trial

In her third issue appellant contends the trial court erred when it denied her motion for new trial. In her motion appellant asserted she was entitled to a new trial because (1) she had produced sufficient evidence to have the December 31 Will admitted to probate; (2) the December 31 Will was prepared by an attorney under Alex's direction; (3) appellee's evidence did not contain any testimony of anyone present at the time the December 31 Will was signed; (4) appellee's testimony was limited to her visit with Alex on December 30, 2009; (5) the jury speculated in order to reach its verdict; (6) the jury's decision was manifestly unjust and against the great weight and preponderance of the evidence; (7) there was factually insufficient evidence to support the jury's verdict; (8)

16

damages found by the jury were excessive and unjustified; (9) there was incurable jury argument; (10) there was no expert medical testimony on the subject of Alex's capacity on December 31, 2009; and (11) the jury engaged in misconduct by considering the family relations argued by appellee's counsel.

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Dir., State Empls. Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 268 (Tex. 1994); *Stevens v. Anatolian Shepherd Dog Club of Am., Inc.*, 231 S.W.3d 71, 77 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law, or if it clearly fails to correctly analyze or apply the law. *Stevens*, 231 S.W.3d at 77. The fact that a trial court may decide a matter within its discretionary authority differently than an appellate court does not demonstrate an abuse of discretion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

Appellant's sole argument in her brief under this issue is: "Thus, all of the arguments made in this brief were presented to the trial court in the motion for new trial. The trial court erred in not granting the motion for new trial." Appellant's motion for new trial, and the arguments made in appellant's brief on appeal, were based on the claims already disposed of in issues one and two, that the evidence was insufficient to support the verdict and there was incurable jury argument relied on by the jury. Having overruled appellant's issues one and two, we likewise conclude the trial court did not abuse its discretion when it denied appellant's motion for new trial. We overrule appellant's third issue.

## CONCLUSION

Having overruled appellant's issues on appeal, we affirm the trial court's judgment.

/s/    Margaret Garner Mirabal
          Senior Justice

Panel consists of Justices Frost, McCally, and Mirabal.[7]

---

[7] Senior Justice Margaret Garner Mirabal sitting by assignment.